J.H. MILES & CO., INC., Chincoteague Seafood Co., Inc., Blount Seafood Corp., Cape May Foods, Inc., Mid–Atlantic Foods, Inc., Rich–Seapak Corp., Nanticoke Seafood Corp., Sea Watch International, Ltd., Surfside Products, Inc., South Jersey Surf Clam, Inc., Borden, Inc., F/V Enterprise, Inc., Beth Dee Bob Partnership, F/V Seaquest, Inc., Plaintiffs,

v.

Ronald H. BROWN, Secretary of Commerce, Defendant.

Civ. A. No. 2:95cv595.

United States District Court, E.D. Virginia, Norfolk Division.

Dec. 4, 1995.

Waverley Lee Berkley, III, McGuire, Woods, Battle & Boothe, Norfolk, VA, Stanley M. Brand, David E. Frulla, Brand & Lowell, Washington, DC, for J.H. Miles & Co., Inc., Chincoteague Seafood Co., Inc., Blount Seafood Corporation, Cape May Foods, Inc., Mid–Atlantic Foods, Inc., Rich–Seapak Corporation, Nanticoke Seafood Corp., Sea Watch International, Ltd., Surfside Products, Inc., South Jersey Surf Clam, Inc., Borden, Inc., F/V Enterprise, Inc., Beth Dee Bob Partnership, F/V Seaquest, Inc.

George M. Kelley, III, United States Attorney's Office, Norfolk, VA, Samuel D. Rauch, III, John L. Marshall, U.S. Dept. of Justice, Env. & Natl. Res. Div., Wildlife & Marine Res. Section, Washington, DC, for Ronald H. Brown.

Geoffrey Footner Birkhead, Vandeventer, Black, Meredith & Martin, Norfolk, VA, for BJ Clam Company, Inc., Eastern Shore Seafood Products, Inc.

## OPINION AND ORDER

DOUMAR, District Judge.

Plaintiffs bring this action challenging the 1995 commercial catch quotas for surf clams and ocean quahogs set by the Secretary of Commerce, Ronald H. Brown, and his designees, and asking that the quotas be set aside. For the reasons discussed below, the Court finds that the plaintiffs' request should be **DENIED.**

### I. Factual Background

Plaintiffs are a coalition of surf clam and ocean quahog [1] processors, as well as owners and operators of fishing vessels from up and down the Eastern Seaboard.[2] Plaintiffs bring this action against the Honorable Ronald H. Brown, Secretary of the Department of Commerce (the "Secretary"), in his official capacity, pursuant to the Magnuson Fishery Conservation and Management Act, 16 U.S.C. § 1801 et seq. (the "Magnuson Act") seeking review of the 1995 commercial catch quotas for surf clams and ocean quahogs (the "1995 quota").

### A. The Magnuson Act

The Magnuson Act was enacted in 1976 to regulate fishery resources in federal waters off the coasts of the United States. 16 U.S.C. § 1801(b). The Act contains several objectives. Most relevant to the case at bar are the dual commands of "promot[ing] do-

---

1. Both the surf clam and ocean quahog are a type of edible clam. Their scientific names are *Spisula solidissima* and *Artica islandica,* respectively. *See* 16 U.S.C. § 1802(4).

2. Plaintiff J.H. Miles & Co., Inc. is a Virginia firm which processes seafood and operates two fishing vessels; it employs approximately 60 people. Plaintiff Chincoteague Seafood Co., Inc. is a Virginia-based processing company. Plaintiff Blount Seafood Corp. is a Rhode Island-based processor which operates three fishing vessels and employs approximately 100 people. Plaintiff Cape May Foods, Inc. of New Jersey processes seafood and employs approximately 160 people. Plaintiff Mid–Atlantic Foods, Inc. of Maryland is a seafood processor employing over 70 people. Plaintiff Rich Sea–Pak Corporation, incorporated in Georgia, is a frozen seafood producer employing 1100 people nationwide. Plaintiff Nanticoke Seafood Corp. of Maryland is a seafood pro-

cessor employing 80 people. Plaintiff Sea Watch International, Ltd. is a Delaware firm processing seafood in Maryland and Massachusetts; it employs roughly 500 people. Plaintiff Surfside Products, Inc. of New Jersey is a seafood processor and operates eight vessels; it employs approximately 100 people. Plaintiff South Jersey Surf Claim, Inc. is a New Jersey firm operating 14 vessels and employing 60 people. Plaintiff Borden, Inc. is a major food conglomerate and shareholder in surf clam and ocean quahog quotas. Plaintiff F/V Enterprise, Inc. of New Jersey operates one vessel. Plaintiff Beth Dee Bob Partnership of New Jersey operates three vessels. Plaintiff F/V SeaQuest of Maryland is a surf clam producer. Amended Compl. ¶¶ 11–24 (for purposes of simplicity, the Amended Complaint will be referred to hereafter as the "Complaint").

mestic commercial and recreational fishing under sound conservation and management principles." 16 U.S.C. § 1801(b)(3); *see also* 16 U.S.C. § 1851(a)(1) ("Conservation and management measures shall prevent over-fishing while achieving, on a continuing basis, the optimum yield from each fishery. . . .").

The Magnuson Act contains seven "National Standards" for fishery conservation and management.[3] Under the Act, Regional Fishery Management Councils promulgate fishery management plans ("FMPs") which regulate fishing within their respective regions. 16 U.S.C. § 1852(h). In general, fisheries off the Atlantic Coast are managed by three different councils: the New England, Mid–Atlantic, and South Atlantic Fishery Management Councils. 16 U.S.C. § 1852(a)(1)–(3). Management of the surf clam and ocean quahog fisheries is the sole responsibility of the Mid–Atlantic Council. 50 C.F.R. § 652.21 (1994).

## B. The Quota–Setting Process

### 1. *In General*

In establishing the annual catch quotas, the Mid–Atlantic Fishery Management Council ("Council") operates within the parameters of what the parties call "Amendment 8," a fishery management plan (FMP) promulgated in 1990, and set forth in 50 C.F.R. Part 652. Amendment 8 provides a range within which annual quotas must be set. Surf clams quotas must be within a range of 1.85–3.4 million bushels per year; ocean quahog quotas must be within a range of 4–6 million bushels per year. 50 C.F.R. § 652.21.

The Council recommends the annual quotas to the Secretary, within the aforementioned ranges, based on *several factors* listed in Amendment 8. The Council must consider "current stock assessments, catch reports, and other relevant information" concerning:

(i) Exploitable and spawning biomass relative to the optimum yield;

(ii) Fishing mortality rates relative to the optimum yield;

(iii) Magnitude of incoming recruitment;[4]

(iv) Projected effort and corresponding catches;

(v) Geographical distribution of the catch relative to the geographical distribution of the resource; and

(vi) Status of areas previously closed to surf clam [or ocean quahog] fishing that are to be opened during the year and areas likely to be closed to fishing during the year.

50 C.F.R. § 652.21. The quota is to be set at a level "most consistent" with the objectives of the FMP. *Id.*

In preparing to recommend the quotas, the staff of the Council review all available data and subject the information to peer review

---

3. The Magnuson Act requires that fishery management plans and regulations implementing those plans be consistent with the national standards, which are as follows:

(1) Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the U.S. fishing industry.

(2) Conservation and management measures shall be based upon the best scientific information available.

(3) To the extent practicable, an individual stock of fish shall be managed as a unit throughout its range, and interrelated stocks of fish shall be managed as a unit or in close coordination.

(4) Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

(5) Conservation and management measures shall, where practicable, promote efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose.

(6) Conservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches.

(7) Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication.

16 U.S.C. § 1851(a).

4. Recruitment is "the number of fish added to the fishery each year due to growth and/or migration into the fishing area." Administrative Record at 961.

before two committees of the Council: a "Scientific and Statistical Committee" and a "Surf Clam and Ocean Quahog Committee" Def. Br. at 7. These committees review the information and present a proposal to the Council. The Council conducts a public meeting to discuss the proposals, and ultimately makes a formal proposal to the National Marine Fisheries Service, an agency of the Department of Commerce. The Fisheries Service funnels the recommendation to the Secretary. In setting the quotas, the Secretary may deviate from the recommendations of the Council only if he can demonstrate that they "violate the national standards of the Magnuson Act" and the objectives of the FMP. 50 C.F.R. § 652.21.

## 2. *The 1995 Quota-setting Process*

In September, 1994, the Council began formulating its recommendations for the 1995 quotas. The Council used a mathematical formula comprised of three numbers: (1) recent quota or catch data (to estimate the current harvest rate), (2) the "supply years" remaining at the current harvest rate (a "supply year" prediction is "an estimate of the number of years that remain before the resource is depleted or 'fished out' "); and (3) the "supply year policy," a number chosen by the Council as a "policy" which would allow the fishery to continue at the same rate for a given number of years. The "supply year

policy" for surf clams is ten years; for ocean quahogs, it is 30 years.

For surf clams, the application of the formula, which is set forth precisely in the footnote below, resulted in a quota of 2.565 million bushels.[5] For ocean quahogs, the application of the formula yielded a quota of 4.9 million bushels.[6] Both quotas were below the 1994 levels. The 1995 surf clam quota was ten percent below the year before; the ocean quahog quota was a reduction of nine percent from 1994. Pl. Br. at 15.[7]

Obviously critical to these calculations are the numbers used in the formula. Plaintiffs allege that both the "supply years" (the multiplicand) and the "supply year policy" (the divisor) were too conservative, and that a higher number should have been chosen, which would have yielded a higher quota. It bears emphasis that the plaintiffs do not seek a quota higher than 1994; rather, they seek retention of the 1994 quota levels.

Underlying all this is the scientific analysis of the state of the fishery, embodied in the "Stock Assessment Reports," which are prepared every few years by the Northeast Fishery Science Center's (NEFSC)[8] Stock Assessment Review Committee. Def. Br. at 7. The assessments are designed, as the term suggests, to describe the "state of the fishery." The reports evaluate the size or abundance of the clam population, the trends in commercial catch data and what is referred to as commercial "effort" data,[9] and

5. The calculation used is as follows:

$$\frac{2,850,000 \times 9}{10} = 2,565,000 \text{ bushels}$$

Key: 2,850,000 = 1994 quota
9 = "supply years" (defined as an estimate of the number of years that remain before the resource is depleted or 'fished out')
10 = "supply year policy" (defined as the policy which would allow the surf clam harvest to continue at the same rate for at least 10 more years)

6. Again, the calculation is as follows:

$$\frac{4,900,000 \times 30}{30} = 4,900,000 \text{ bushels}$$

Key: 4,900,000 = average annual harvest for last 3 years
30 = "supply years" (defined as an estimate of the number of years that remain before the resource is depleted or 'fished out')

30 = "supply year policy" (defined as the policy which would allow the surf clam harvest to continue at the same rate for at least 30 more years)

7. The final rule characterizes the reduction in the quahog quota as a 12.5 percent drop. A.R. 1071. The Court agrees with the plaintiffs that the reduction is 9 percent. In any event, the percentage of the reduction is not relevant to deciding the questions of law presented.

8. The NEFSC is operated by the National Oceanic & Atmospheric Administration, which is part of the Commerce Department.

9. This is categorized in terms of Landings Per Unit Effort (LPUE), also known as "Catch Per Unit Effort" (CPUE). This reflects the amount of fishing time a vessel has to spend to harvest a certain amount of fish. If the fish are scarce, it should take more effort to catch them and LPUE should fall. If they are abundant, they should be

data compiled by research survey vessels, which survey the fishery every two or three years by collecting clams in the major fishing areas over a period of several weeks.

Two facts which made the 1995 quota process different from the norm bear particular emphasis. First, in estimating biomass, or population abundance, the scientists employed a new scientific model in 1995, referred to as the "modified DeLury model." This model "combines commercial and survey abundance indices, along with annual catch data to estimate annual fishing mortality and stock sizes." A.R. 678. The "DeLury" model replaced the "area swept biomass" model previously utilized, which relied on the research vessel survey data exclusively. *Id.* The decision to shift to a new model had been recommended in the 1993 stock assessment, also known as the Report of the 15th Stock Assessment Workshop (15th SAW). A.R. 30, 45.[10]

Second, there was substantial controversy surrounding the research survey conducted in the summer of 1994 by the NEFSC research vessel, the *Delaware II.* The survey results suggested a large increase in the surf clam and ocean quahog population in most of the major areas of the fishery. Because the data produced by the 1994 survey were so at variance with 19 previous surveys conducted over the past three decades, the Council, and by extension the Secretary, decided that the results were a scientific anomaly, and could not be relied upon in setting the 1995 quotas. The results were thus not incorporated into the most recent Stock Assessment Report and have been "set aside," pending further scientific review. A.R. 1072. The plaintiffs' case rests largely on the 1994 survey. They contend that the survey indicates a significant recruitment to the fishery over the past several years, that the stocks are more abundant than previously believed, and that setting aside the 1994 survey in establishing the 1995 quotas, *inter alia,* violated several standards of the Magnuson Act.

These contentions are analyzed in detail below.

## II. Procedural Background

The action arises from the Secretary's promulgation of the final rule implementing the 1995 quotas, which are in effect during calendar year 1995. The Secretary promulgated the quotas on May 15, 1995. A.R. 1071. Plaintiffs filed this action on June 9, 1995, within the 30 day time limit prescribed by the Magnuson Act. 16 U.S.C. § 1855(b)(1). At the same time, plaintiffs moved for expedited consideration of the case, pursuant to 16 U.S.C. § 1855(b)(4) (upon motion by petitioner the "appropriate court shall assign the matter for a hearing at the earliest possible date and shall expedite the matter in every possible way"). On July 24, 1995, defendant Brown filed his answer and a motion for summary judgment. Defendant also moved to limit the scope of review to the Administrative Record. On August 18, 1995, plaintiffs moved for summary judgment.

The Court heard oral argument on the cross-motions for summary on October 2, 1995. The Court reserved judgment on the motions and expedited consideration of the case. On October 10, 1995, Plaintiffs made a motion to compel the defendant to produce certain information. The Court granted the motion in part and denied the motion in part. On October 17 to 19, 1995, the Court conducted an evidentiary hearing; following the hearing, the parties submitted additional briefs.

Jurisdiction is appropriate under 28 U.S.C. § 1331.

## III. Judicial Review under the Magnuson Act

 Judicial review of agency decisions under the Magnuson Act is limited by 16

---

easier to catch and LPUE should be high. *Id.* at 18.

**10.** Although the use of a new model had been decided upon in 1993, that earlier assessment had not specified that the DeLury model be used. The plaintiffs suggested, with some force, that this model and its resulting data were used as a *post hoc* rationalization for the quota decision made by the Council in September, 1994. The Court shares the plaintiffs' suspicion in this regard, but lacking proof, cannot find that use of this scientific model was arbitrary.

U.S.C. § 1855(b), which incorporates most of the standards of review of the Administrative Procedure Act.[11] Challenged regulations may be invalidated only if the regulations are (1) arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law; (2) unconstitutional; (3) in excess of statutory jurisdiction; or (4) promulgated without observance of procedure required by law. 16 U.S.C. § 1855(b) (incorporating 5 U.S.C. § 706(2)(A)–(D)). *See also Kramer v. Mosbacher,* 878 F.2d 134, 136 (4th Cir.1989). Courts must conduct a "searching and careful" inquiry into the agency decision, although this review is ultimately a "narrow" one. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). In general, courts accord great deference to agency decisions. "In short, the Secretary has broad discretion in promulgating regulations to implement the [FMP] and the Court may only consider 'whether this discretion was exercised rationally and consistently with the standards set by Congress....'" *Southeastern Fisheries Ass'n v. Mosbacher,* 773 F.Supp. 435, 439 (D.D.C.1991), (quoting *Louisiana v. Baldridge,* 538 F.Supp. 625, 628 (E.D.La.1982) and *Maine v. Kreps,* 563 F.2d 1052, 1055 (1st Cir.1977)); *C & W Fish Co, Inc. v. Fox,* 931 F.2d 1556, 1562 (D.C.Cir.1991); The Secretary's actions are presumed valid; accordingly, the Court cannot simply substitute its judgment for the Secretary's. *Washington Crab Producers, Inc. v. Mosbacher,* 924 F.2d 1438, 1441 (9th Cir.1991); *National Fisheries Institute, Inc. v. Mosbacher,* 732 F.Supp. 210, 219 (D.D.C.1990). Instead, the court must find that the administrative record is so devoid of justification for the Secretary's decision that the decision is necessarily arbitrary and capricious. *Organized Fishermen of Florida, Inc. v. Franklin,* 846 F.Supp. 1569, 1573 (S.D.Fla.1994); *Southeastern Fisheries Ass'n v. Mosbacher,* 773 F.Supp. at 439; *National Fisheries Institute, Inc.,* 732 F.Supp. at 219. In applying these standards, courts must also assess whether prejudice has resulted. 5 U.S.C. § 706 (courts applying arbitrary and capricious standard shall give due account of rule of prejudicial error). *See*

*Newport News Shipbuilding & Dry Dock Co. v. General Dynamics,* 960 F.2d 386, 392 (4th Cir.1992); *Hostetter v. United States,* 739 F.2d 983, 986 (4th Cir.1984).

## IV. Discussion

### A. Motion to Limit Review to the Administrative Record

At the outset, the Court must address the defendant's contention that review of his decision must be limited only to the Administrative Record, and his objection to the evidentiary hearing conducted by this Court. For this proposition, the defendant cites *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985); and *Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) (per curiam). These cases, the defendant argues, prohibits the court from hearing additional testimony or from conducting a *de novo* review—which, defendant contends, this Court conducted in the case at bar. Def. Supp. Br. at 3.

It is difficult to take defendant's latter contention seriously. A *de novo* review would have resulted in, as the term suggests, a *completely new proceeding.* It would have involved testimony from each participant in the quota setting process. It would have required the presence in court of the members of the Mid–Atlantic Fisheries Council, the scientists sitting on the peer review committees, officials of the National Marine Fisheries Service, and, ultimately, the Secretary of Commerce himself. Such testimony, reviewing in detail every step of the quota-setting process, would have consumed several weeks. As the defendant knows, no such hearing occurred. The Court conducted, over the course of three days, a limited review that sought an explanation, in laymen's terms, of the voluminous Administrative Record.

Such a review was necessary in view of the massive amounts of data in the record, much of which could not be interpreted without

---

**11.** Only the first four subparagraphs of the Administrative Procedure Act's judicial review pro-

vision are incorporated under the Magnuson Act. 16 U.S.C. § 1855(b)(1)(B).

explanation. A considerable portion of the record contains charts and data tables requiring advanced training in statistics or marine biology to interpret adequately. *E.g.,* A.R. 205–213, 263–334, 377–407. The Court is neither a statistician nor a biologist. It is absurd to believe that the Court must judge whether the agency's decision was "arbitrary and capricious" based solely on a record that only an expert can comprehend fully. No court can undertake the sort of "searching review" required, *see Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. at 824, or assess whether the Secretary's decision had a "rational basis" without an understanding of the information upon which the Secretary based his decision. *See Arkla Exploration Co. v. Texas Oil & Gas Corp.,* 734 F.2d 347, 357 (8th Cir.1984), *cert. denied,* 469 U.S. 1158, 105 S.Ct. 905, 83 L.Ed.2d 920 (1985) (endorsing hearing to consider explanatory evidence); *Asarco, Inc. v. Environmental Protection Agency,* 616 F.2d 1153, 1159–60 (9th Cir.1980) (court may go outside record for explanation of highly technical matters). The defendant's position would, in cases involving complicated scientific or technical data, effectively render judicial review of agency decisions, already greatly limited in scope, a nullity.

Moreover, the cases cited by the defendant seem to welcome the inquiry conducted by this Court. For example, the Supreme Court stated in *Citizens to Preserve Overton Park* that courts may "require administrative officials who participated in the decision to give testimony explaining their action," especially where the "bare record may not disclose the factors that were considered or the Secretary's construction of the evidence." 401 U.S. at 420, 91 S.Ct. at 825. *See also Virginia Agric. Growers Ass'n v. Donovan,* 774 F.2d 89, 92 (4th Cir.1985) (court may obtain additional explanation from agency, either through affidavits or testimony, if record unclear). Fairly read, the "bare record" does not disclose all the factors considered— some of which were subsequently brought out in testimony in this Court.

The decision to "set aside" the 1994 research survey data illustrates the point. The proposed rule regarding the 1995 quotas makes no mention of that survey. A.R. 854–56. The final rule sheds some light on the issue, stating that the 1994 survey data "represent an anomaly" which would be "unscientifically sound" to accept inasmuch as there was a "sudden and dramatic increase" for every size of both species. A.R. 1071, 1072. There is not much elaboration of the issue in the minutes of the Mid–Atlantic Council meeting of February 1–2, 1995, A.R. 846–53, or in the report of the 19th Northeast Regional Stock Assessment Workshop (19th SAW), A.R. 950–52, 964–66, 970–72. In testimony, the Court received a detailed explanation from Dr. Murawski, the government scientist who is one of the preeminent experts on the clam fishery, which proved helpful to the Court's understanding of the reasons for setting aside the data.

■ The Supreme Court has instructed that, except in "rare circumstances," the proper course for a reviewing court is to "remand to the agency for additional investigation or explanation." *Florida Power & Light, supra,* 470 U.S. at 744, 105 S.Ct. at 1607. This is one of those rare circumstances. The Magnuson Act requires the Court to "expedite the matter in every possible way" upon motion by petitioner. 16 U.S.C. § 1855(b)(4). The reason is obvious: the fishing quotas apply for just twelve months. Were the Court to remand to the Department of Commerce for "additional explanation," the process would be unnecessarily lengthened. Explanation procured by the Court from the Department would undoubtedly raise more questions, requiring a further Department response. This continued flow of paper between the Court and the Department would probably ensue for weeks, more likely months. By the time the process was completed, the case might be moot, or an effective remedy for plaintiffs, should they prevail, might be unavailable. Here, the Court spent three days hearing a handful of witnesses. It was able to judge the testimony of these witnesses first-hand. The testimony of Dr. Murawski took up roughly 50 percent of the evidentiary hearing.

■ The "focal point" of this Court's review is, as it must be, on the Administrative Record. *Virginia Agric. Growers Ass'n,* 774

F.2d at 92 (4th Cir.1985) (citing *Camp v. Pitts*, 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (per curiam)). But the law does not constrict this Court's review only to that record. Defendant's motion to limit review to the Administrative Record is therefore **DENIED.**

## B. Plaintiffs' Claim

Plaintiffs' claim contains seven counts. Counts I–V and Count VII allege violations of the Magnuson Act by the Secretary's designees, and that such violations were "arbitrary and capricious" in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C), & (D) (1989) ("APA"). Count VI is under the APA itself, alleging that the adoption of a certain standard by the Secretary's designees was invalid because it was not subject to notice or comment proceedings as required by 5 U.S.C. § 553 (1989). These claims are addressed in detail below.

### 1. *National Standard One (Count I)*

National Standard One of the Magnuson Act requires that "conservation and management measures shall prevent overfishing, while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." 16 U.S.C. § 1851(a)(1).

Plaintiff contends that "rejecting the 1994 data and setting the 1995 quotas based on ultra-conservative assumptions impermissibly exalts conservation over reasonable use of the resource." Pl. Br. at 74–75. Defendant counters that achieving the "optimum yield" requires a balancing of interests. The 1995 quotas, defendant avers, are designed to achieve such a balance by ensuring that the current level of fishing can be sustained on a continuing basis for a "reasonable amount of time." Def. Br. at 33.

■ Plaintiffs' contention must fail. The statute defines "optimum" as the yield from a fishery that

will provide the greatest overall benefit to the Nation, with particular reference to food production ... which is prescribed as such on the basis of maximum sustainable

yield from such fishery, as modified by any relevant economic, social or ecological factor.

16 U.S.C. § 1802(21). "Optimum yield" is not the same as "maximum yield." Instead, it is based on "maximum *sustainable* yield," which is defined as the "largest average annual catch or yield that can be taken over a significant period of time from each stock under prevailing ecological and environmental conditions." 50 C.F.R. § 602.11(d)(1). Maximum sustainable yield "may only be the starting point ... and may need to be adjusted because of environmental factors, stock peculiarities, or other biological variables." 50 C.F.R. § 602.11(d)(3). As the above statutory and regulatory language indicates clearly, the Magnuson Act envisages a balancing of several interests. *See also* 50 C.F.R. § 602.11(b) ("determination of [optimum yield] is a decisional mechanism for resolving the [Magnuson] Act's multiple purposes and policies"). Moreover, as National Standard One expressly states, management measures must aim to achieve, on a *continuing* basis, the optimum yield from each fishery, not the optimum yield in a single year. *See also* 50 C.F.R. § 602.11(b) ("most important limitation on the specification of [Optimum Yield] is that the choice of [Optimum Yield]—and the conservation and management measures proposed to achieve it—must *prevent overfishing*") (emphasis added).

■ Based on this standard, the Court cannot say that the balancing undertaken by the Secretary was irrational. The Administrative Record and the testimony in this Court make clear that the Secretary weighed the competing interests required by the Magnuson Act. In reducing the quotas, he was acting in what he believed to be the long-term health of the fishery. *E.g.*, A.R. 1072 (final rule). Such an approach is not inconsistent with the command of National Standard One to "prevent overfishing, while achieving, on a continuing basis, the optimum yield." The Court FINDS that the Secretary had a rational basis for his decision, and therefore it was not arbitrary and capricious or an abuse of discretion in relation to National Standard One.

### 2. *National Standard Two (Count II)*

National Standard Two of the Magnuson Act requires that "[c]onservation and management measures shall be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2). The pertinent regulations define "scientific information" to include biological, ecological, economic and social data. 50 C.F.R. § 602.12(b)(1). That information need not be absolutely comprehensive. "The fact that scientific information concerning a fishery is incomplete does not prevent the preparation and implementation of an FMP." 50 C.F.R. § 602.12(b). Further, the regulations provide for the possibility that differences in the available information will exist. "If there are conflicting facts or opinions relevant to a particular point, a Council may choose among them, but should justify the choice." 50 C.F.R. § 602.12(b)(1).

Reviewing courts have been reluctant to find that the best scientific information available was not utilized. *See Northwest Environmental Defense Center v. Brennen*, 958 F.2d 930, 936 (9th Cir.1992); *Washington Crab Producers*, 924 F.2d at 1448–49; *Southeastern Fisheries Ass'n*, 773 F.Supp. at 442; *National Fisheries Institute*, 732 F.Supp. at 220. This Court so found in a 1994 case regarding the quota for summer flounder. *Fishermen's Dock Co–Op v. Brown*, 867 F.Supp. 385, 396 (E.D.Va.1994). *See also Parravano v. Babbitt*, 837 F.Supp. 1034 (N.D.Cal.1993), where the court held that although the Secretary was entitled to reject the Pacific Fishery Management Council's recommendation, "the particular manner by which the Secretary chooses to address the problem must have some support in the Administrative Record...." *Id.* at 1046.

#### (a) *The 1994 research survey*

There are two aspects to this count. The first is that the Secretary failed to use the "best scientific information available" in choosing to set aside the 1994 survey data, and that this action was arbitrary and capricious. The evidentiary hearing conducted in this Court focused largely on this issue, so some additional facts will be set forth before discussing this claim.

As noted above, from July 18 to August 24, 1994, a research survey was conducted by the NEFSC research vessel, the *Delaware II*. The survey results suggested a large increase in the surf clam and ocean quahog population. These results were at odds with 19 previous surveys which had been conducted every two or three years since 1965. *See* A.R. 189 (summary of survey vessel cruises). The National Marine Fisheries Service (NMFS) scientists aboard the *Delaware II* realized that more clams were being captured by the dredge than in earlier surveys, and speculated that perhaps it was caused by the use of a different tow point on the vessel. Accordingly, certain survey areas, or strata, were surveyed for a second time using the "classical" tow position (i.e., the tow position historically used). A.R. 154. The change in the tow position apparently had little effect on the amount of clams being captured by the research vessel.

In mid-September, 1994, the scientific committees met to discuss the 1995 clam quotas. Later that month, the Mid–Atlantic Council met to make its initial recommendations for the 1995 quotas. At this point, though the data from the 1994 research survey had been collected, it had not been fully analyzed by the NMFS scientists. The data was not available until October 13, 1994. Thus, the initial recommendation of the Council was made without a complete picture of the from the 1994 research survey.

Analysis of the data by the NMFS scientists and the peer review committees resulted in a conclusion that the data was "anomalous" in that it did not "fit" biologically with prior survey results. The defendant's designees concluded that the survey was "markedly and scientifically incompatible with 19 previous survey cruises." A.R. 1072. Dr. Murawski, the government's expert witness, elaborated on this point during the evidentiary hearing. First, he stated that the results were inconsistent with trends in previous surveys and in commercial catch data. In the area off Northern New Jersey, for example, an approximately three-fold increase in the population had apparently occurred. In Southern New Jersey, a more dramatic increase was apparently discovered: 20 times

more surf clams were found. A.R. 191–92. *See also* A.R. 193–94 (surf clam data for Delmarva[12] and Southern Virginia/North Carolina). The results were generally similar for ocean quahogs. In Northern New Jersey, the population had apparently increased nearly two and half times, A.R. 441, although the population apparently declined off the Delmarva coast. A.R. 440. Second, the data did not suggest a significant "recruitment event"—referred to colloquially as a "baby boom event"—because the size structure of the catch had not changed. If a "baby boom" had occurred, the theory holds, then the "size structure" data adduced[13] would have shown a large increase in smaller clams. Clams grow at a slow and steady rate,[14] and therefore a significant recruitment would have meant that the smaller clams should have been far greater in number relative to the rest of the population. The 1994 survey, however, found many more clams in all size categories than had been previously found. Third, use of the data in the scientific models employed to predict population abundance suggested strongly that the data were an anomaly: the results did not "fit" well statistically,[15] and were "outside the confidence levels," [16] i.e., outside acceptable parameters of reliability, set by the scientists.

The Secretary's designees considered several explanations for the purportedly skewed results: that perhaps the dredge used on the research vessel was "too efficient," or that the research vessel had traveled faster than in the past, or that the pump used with the dredge had performed differently than in the past. None of these theories proved conclusive in explaining the results. Accordingly, because the Secretary's designees could find no logical explanation for what they perceived to be scientifically anomalous data, they agreed to set aside the 1994 survey pending further scientific investigation.

Whatever the cause of the supposedly newfound abundance, the survey results confirmed, according to the plaintiffs, what they suspected all along: that there are more clams in the fishery than the government will concede. Plaintiffs contend that government scientists, including some involved in the quota process, have known for years that previous survey data had been too conservative, and offer as evidence scientific papers authored by such scientists. Pl. Br. at 37–38. Plaintiffs also argue that shellfish are sedentary, and thus it is unlikely that the shellfish detected in the 1994 survey appeared out of thin air. In other words, these fish have always been there; it is just that the survey vessel failed to detect them in the past. *Id.* at 40. In essence, the plaintiffs aver that the survey vessel finally discovered how to catch clams, and that the previous 19 surveys, not the most recent survey, are anomalous. Finally, plaintiffs contend not that a "baby boom" occurred, but that there has been a slow, steady recruitment over several years, which the previous surveys missed. Pl. Br. at 43–45.

The question before the Court is this: was the 1994 research survey data the "best" scientific information available? To state it simply, there are two possible explanations for the 1994 survey data: either (1) a larger number of clams than previously estimated

12. The "Delmarva" coast is the area off lower Delaware, and the Eastern Shores of Maryland and Virginia.

13. The data generated by the research survey vessel produces information not only on the total number of fish present, but on the numbers within certain size categories.

14. Surf clams reach harvestable age at 6 years, and can live up to 35 years. Ocean quahogs take 30 years to reach harvestable age, and can live up to 200 years. A.R. 73–74.

15. Statisticians use a term known as "goodness of fit" to describe a comparison between observed frequency distribution with a distribution expected according to set of assumptions. John E. Freund & Gary A. Simon, *Modern Elementary Statistics* 380 (8th ed. 1992).

16. A confidence interval or level is "an estimate, expressed as a range, for a quantity in a population. If an estimate from a large sample is unbiased, a 95% confidence interval is the range from two standard errors below the two standard errors above the estimate." David H. Kaye & David A. Freedman, *Reference Guide on Statistics in Reference Manual on Scientific Evidence* 396 (1994). "For a given confidence level, a narrower interval indicates a more precise estimate." *Id.* at 376.

have always been in the fishery, but have been undersampled in the past; or (2) the observed increase might mean that the 1994 survey was not performed properly. The plaintiffs favor the former explanation; the defendant favors the latter. It is not disputed that the survey results were greatly at variance with the surveys conducted over the past thirty years. The question is whether all these previous surveys were in error, or whether the 1994 survey was in error.

The plaintiffs' position deserves further elaboration. The plaintiffs offered evidence from an operator of a commercial clam boat, Mr. Carlson, who also conducts research surveys each year for the State of New Jersey. Mr. Carlson provided two interesting insights. First, he testified that the New Jersey survey revealed a sharp increase in the clam population in the in-shore waters,[17] which was confirmed by data received from the State of New Jersey. In the inner-most mile, the clam population had grown by 28.4 percent between 1992 and 1994. In the outer-most mile of the in-shore fishery, the growth had been smaller, just 0.9 percent.[18] In the middle mile, the fishery had decreased by 2.8 percent. *See* Def. Ex. 25. The defendant's expert testified that the increase in the inner-most mile occurred because the warmer temperatures found closer to shore foster clam growth, and because the shallow waters found near shore foster recruitment.

Second, Mr. Carlson stated that it is difficult to catch clams when traveling at a speed below 1.8 knots.[19] He indicated that commercial clammers always travel 1.8 knots or greater. The *Delaware II*, at the instruction of the scientists, historically has traveled at a speed of 1.5 knots. The captain of the *Delaware II* testified, however, that during the 1994 survey, he had trouble maintaining that speed, and frequently engaged the clutch (eliminating any power in the propeller) in order to slow to the desired 1.5 knots. In other words, the speed of the vessel necessarily exceeded 1.5 knots per hour and thus when the clutch was engaged the boat was either coasting or drifting to ensure that it would not travel over 1.5 nautical miles in one hour. The defendant's expert argued that it is not valid to compare speeds between the *Delaware II*, a large boat (155 feet), and the smaller commercial clam boats (Mr. Carlson's two boats were 67 feet and 103 feet). This appears to be a distinction without a difference. A dredge should travel the same speed over the bottom regardless of the size of the boat.

To the Court, the testimony from Mr. Carlson and the captain of the *Delaware II* raises questions about the methodology used by the research survey vessel. Commercial clam boats do not travel as slowly. Speed of the boat appears, at least on this evidence, to be an important factor in collecting clams. The *Delaware II* captain was instructed to travel at a speed slower than his boat can apparently travel with the propellers engaged. The Court is not familiar with the tactic of "drift dredging" apparently employed here. The Court is therefore skeptical that the speed chosen for the federal survey was the proper one. In short, it may well be that the research survey vessel, the *Delaware II*, has been traveling too slowly to capture clams in a manner similar to commercial fishermen.

This is not to suggest that the research vessel must duplicate exactly the methods of commercial fishermen; but it does seem logical that the research survey should closely approximate the methods used by commercial fishermen, inasmuch as commercial catch data and survey data are both employed in the scientific models used to estimate population abundance.[20]

---

**17.** Under the Magnuson Act, the federal government regulates the waters from 3 miles from shore to the edge of the "Exclusive Economic Zone," or 200 miles from shore. State governments regulate the waters out to 3 miles; these are referred to as "in-shore" waters.

**18.** This outer mile is immediately adjacent to what would be the *inner* mile of the federal fishery.

**19.** A speed of one knot is one nautical mile per hour. A nautical mile is 6076.12 feet.

**20.** Logic and science, however, do not always seem compatible in this case.

■ But that question need not be resolved to decide this case. The question here focuses not on boat speed, but on the discrete question of whether the Secretary had a rational basis to set aside the 1994 survey data. Were the Court acting as Secretary of Commerce, the Court might have chosen differently. The question is close enough that reasonable people can disagree about whether, on the merits, the 1994 research survey should have been accepted or rejected. Review under the Administrative Procedure Act, however, prevents the Court from deciding on the merits whether the survey should be accepted—in effect, substituting its judgment for the Secretary's. Instead, the Court is limited to deciding whether the record is so devoid of justification for the Secretary's decision that the decision is necessarily arbitrary and capricious. *Organized Fishermen of Florida, Inc. v. Franklin,* 846 F.Supp. 1569, 1573 (S.D.Fla.1994). Based on that standard, after reviewing all the evidence carefully, the Court cannot say that setting aside the 1994 survey was arbitrary and capricious.

The defendant offered sufficient grounds, discussed above, for rejecting the 1994 survey data. Stated simply, the defendant concluded that the data did not make sense, scientifically, in view of decades of previous survey results. The Court cannot say that this judgment was unscientific, or arbitrary and capricious. To accept the 1994 data would have required the Secretary's designees to disregard three decades of data gathered in the same manner, using the same boat speed, as the 1994 survey. It is not an uncommon practice in statistical analysis to throw out the high and low results in a series, or results that do not square with historical data. Indeed, the defendant's expert testified that this was not the first time the National Marine Fisheries Service had rejected high and low data points with regard to fishery data, although this was the first time such had occurred with regard to the clam fisheries. Moreover, the Magnuson Act permits the Secretary's designees to act on information that is incomplete or if there are differences in available information. 50 C.F.R. § 602.12(b). Presented with a recommendation from a body of scientists and the Council, the Secretary had a rational basis for setting aside the 1994 research survey.

The Court notes, finally, that the question would be a far different one if the National Marine Fisheries Service, in a subsequent survey, produces results similar to the 1994 survey, and again elects to "set aside" the data; or, alternatively, if the Service fails to conduct another research survey in 1996.[21] That case, of course, is not now before the Court.

The Court therefore **FINDS** that setting aside the 1994 research survey data was not arbitrary and capricious.

(b) *Assumptions Utilized in Quota–Setting Process*

Count II also involves a question about whether the Secretary's designees used the "best scientific information available" in making certain assumptions about data or the fishery in ascertaining the "supply years" remaining. The "supply year" number, as noted previously, is used as the multiplicand in the quota-setting formula.

■ As this Court stated in *Fishermen's Dock,* "[p]laintiffs bear a heavy burden in this regard. They cannot only show that the defendant's designees could have used other methods or considered other factors. They must also show how and by how much using the "better" scientific information would have the changed the 1995 quotas." 867 F.Supp. at 393. In essence, they must demonstrate the prejudice required under the Administrative Procedure Act. *See* 5 U.S.C. § 706. Each disputed figure will be discussed in turn.

**(1) Recruitment**

(A) *Surf Clams*

The process of setting the 1995 quotas involved, in essence, two decision points. In September, 1994, the Council met to prepare

---

**21.** No survey was conducted this past summer. The *Delaware II* was in drydock undergoing re- pairs.

its initial recommendations. It met again in February, 1995 to reconsider its recommendations in view of the 1994 research survey.

The "supply year" for surf clams (the multiplicand in the quota-setting formula) was derived from two ranges produced at two different times. The initial range considered by the Council was 9 to 12 years; it was extrapolated from the Report of the 15th Stock Assessment Workshop, produced in 1993, which found that there were 11 to 14 "supply years" remaining in the surf clam fishery. A.R. 30. The extrapolation was a simple matter of subtraction: the two years that had passed were subtracted from the 1993 assessment. In making this extrapolation, the Council made two assumptions: that "current harvest patterns" had remained the same since the 1993 assessment, and that there was "no evidence of significant recruitment." A.R. 77.

It appears, however, that the Council assumed not that there was no "significant recruitment," but that there was *no recruitment at all.* Defendant apparently does not dispute the point. *See* Def. Reply Br. at 25. In essence, because the scientific model used in the 1993 assessment could not factor in recruitment, *id.,* the Council assumed that while the annual harvest reduced the fishery, no new clams entered the fishery to replace those clams removed.[22]

The Administrative Record is bereft of meaningful discussion on whether "no significant recruitment" was the equivalent of "no recruitment." Although some discussion did occur regarding the definition of "significant" recruitment, there was no resolution of the question. During a meeting of the Surf Clam and Ocean Quahog Committee on September 12, 1994, for example, Mr. McVey, a Council member with long experience in the industry, borrowed Justice Stewart's famous definition of pornography to describe the term: "You can't explain it, but you know it when you see it." A.R. 100. Mr. Keifer, the Executive Director of the Council, insisted that there had been "significant discussion"

of the word "significant" throughout the process, but did not explain whether the quota recommendations assumed zero recruitment, *or some* recruitment on a continuum between zero and "significant." A.R. 109.

This is not science. It is nothing more than an arbitrary determination that zero recruitment—an absurd assumption on its face—occurred.

But the story does not end there. In early 1995, a new "stock assessment" was produced which led to a prediction that the number of "supply years" remaining was a range of 5 to 9 years. This result was contained in the Report of the 19th Stock Assessment Workshop, referred to as the 19th SAW. A.R. 964.

 Thus, even if the 9 to 12 year range is discounted as the result of an arbitrary assumption, defendant would have relied on this second range—which did consider recruitment. Plaintiffs cannot show the prejudice required under the Administrative Procedure Act unless they can show that the resulting multiplicand would have been different. Had the Secretary's designees employed only the 5 to 9 year range, then the best result, from the plaintiffs' perspective, would have been the use of 9 as the multiplicand—which was precisely what did occur.

Plaintiffs also aver that in calculating the 5 to 9 year range, the Secretary's designees used unreasonable assumptions about recruitment. But in fact the record is clear that the Secretary's designees made the very assumptions about recruitment urged by plaintiffs. *See* A.R. 964 (forecast table of supply years for surf clams). The range of 5–9 years (expressed as an 80 percent probability) set forth in that table assumes a level of recruitment (11,471 metric tons per year) that plaintiffs argue should be assumed. *See* Pl. Br. at 65.[23]

In sum, the Court cannot find for the plaintiffs on this issue.

---

**22.** The problem with this theory is that there is a distinction between sterility and fertility, which is apparently not recognized by the "science" used here.

**23.** Plaintiffs only apparent grounds for complaining is that the range of supply years did not include the "maximum" of 23 years, which was outside the 80 percent confidence interval.

### (B) *Ocean quahogs*

The recruitment assumptions for ocean quahogs present an easier question. First, it bears emphasis that the 1995 stock assessment, which predicted a supply year range of 8 to 15, was not utilized by the Secretary. Def. Reply Br. at 25 n. 14. The only question is whether it was reasonable for the Council to assume no recruitment in using 30 as the multiplicand in the quota-setting formula. The 1993 stock assessment had predicted that the supply year range in 1993 was 22 to 32. The Council apparently made the same extrapolation as it did with surf clams, thus creating a range of 20 to 30 years. A.R. 78.

As stated above, the Court assumes that *zero* recruitment is not scientific. It is arbitrary. But even assuming a steady state, i.e., that the harvest rate and recruitment were equivalent for quahogs, the range would have remained at 22 to 32 years. 30 years was chosen. It is hard to see how this prejudiced plaintiffs, inasmuch as the Council might have chosen a much lower number as the multiplicand and still remained within the supply year range.

### (2) Surf clam mortality

Plaintiffs argue that the defendant used an unduly high estimate for natural mortality[24] for surf clams in the 1993 stock assessment. There is no suggestion that this claim applies to ocean quahogs.

Plaintiffs note that the estimate of total mortality, or "Z," in Northern New Jersey was 0.06. In devising the supply year range, the stock assessment made two assumptions about natural mortality, or "M:" 0.02 and 0.06. The higher value of 0.06, plaintiffs contend, is impossible because it assumes that no surf clams were harvested, inasmuch as total mortality is the sum of natural mortality and mortality due to fishing. Plaintiffs fail to note, however, that the stock assessment also made an erroneous assumption in their favor; that is, the stock assessment assumed a natural mortality rate of 0.02 and 0.06 for Delmarva, even though the model

had suggested that M was as high as 0.1. A.R. 27. Using that higher rate, the lower end of the supply year range for Delmarva would have been only 22 years, not the 30 years that resulted by using the mortality rate of 0.06. *Id.*

The degree to which these two errors affected the supply year range is not clear to the Court. Nonetheless, this inability is unimportant. As discussed above, the 1995 stock assessment report produced a much lower supply year range of 5 to 9 years, which the Secretary's designees considered before recommending the final quota. There is no suggestion that the mortality rate assumptions there were flawed.

Accordingly, the plaintiffs have not met their burden of demonstrating how the quotas would have changed. The Court cannot find for the plaintiffs on this issue.

### 3. *National Standard Five (Count III)*

National Standard Five of the Magnuson Act requires that "[c]onservation and management measures shall, where practicable, promote efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose." 16 U.S.C. § 1851(a)(5).

Plaintiffs contend that by reducing the quotas, the fishery's resources will be wasted, not efficiently utilized, Compl., ¶ 118, and that the Secretary violated the Magnuson Act's dictate that management measures should "avoid creating strong incentives for excessive investment in private sector fishing capital and labor." 50 C.F.R. § 602.15 (regulations discussing National Standard Five).

The balancing permitted under National Standard Five is not dissimilar from that under National Standard One. The statute makes clear that efficiency, though important, is neither the sole nor primary objective of conservation and management measures. The statute says only that the Secretary shall *promote* efficiency "*where practicable.*" *See also* 50 C.F.R. § 602.15(b)(1) (management measures should result in "as efficient a fishery as is practica-

---

**24.** "Natural mortality" is deaths due to causes other than fishing. A.R. 960. Total mortality is expressed as "Z," combining natural mortality ("M") and death due to fishing ("F"). *Id.*

ble or desirable" but may conflict with other "legitimate social or biological objectives of fishery management"). It is permissive; it does not require absolute efficiency. Nor does the Secretary have to conduct a formal "cost/benefit" analysis. *Alaska Factory Trawler Ass'n, supra,* 831 F.2d at 1460.

The Administrative Record contains evidence that the Secretary and his designees were cognizant of the efficiency question in devising the quotas. For example, the Executive Director of the Mid–Atlantic Council noted, in a memo to the Council dated September 2, 1994, that declining CPUE rates result in higher costs of production for clammers, and that a decline in the clam population could present a "cost barrier.... beyond which fishermen will be unable to cross in the near term." A.R. 75 (internal quotation omitted).

■ The Court cannot say, based on the evidence, that the reduction in the quotas increase or decrease efficiency. But this inability is unimportant, because the measure of efficiency is not the test under the Magnuson Act. The test is whether the measures taken "promote" efficiency "where practicable." On this record, the Court cannot say that the Secretary's actions were arbitrary and capricious, or violated National Standard Five. The Court FINDS that the Secretary had a rational basis for his decision, and therefore that it was not arbitrary and capricious or an abuse of discretion in relation to National Standard Five.

### 4. *National Standard Six (Count IV)*

National Standard Six requires that "[c]onservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches." 16 U.S.C. 1851(a)(6).

Plaintiffs contend that the 1995 quotas "fail to take into account adequately, if at all, the fact that the surf clam and ocean quahog stocks have improved dramatically," Compl. ¶ 122, and that the 1994 research survey data requires the defendant to respond by leaving the 1994 quotas in place, instead of imposing lower quotas in 1995. Defendants counter that National Standard Six "merely requires flexibility" so that fishery management can respond to changes in the industry. "It does not require the agency to immediately raise a quota level on the basis of controversial, and scientifically suspect data." Def. Br. at 39.

This count can be disposed of without much discussion. National Standard Six, on its face, dictates flexibility on the part of fishery managers. It suggests that the Secretary and his designees must be prepared to address uncertainties or changes that might arise. As the implementing regulations state, the "regime chosen must be flexible enough to allow timely response to resource, industry and other national and regional needs." 50 C.F.R. § 602.16(b).

■ The essence of the plaintiffs' argument is that the Secretary was inflexible, and wrongly so, because he failed to *use* the 1994 research survey data in establishing the 1995 quota. But the statute imposes no such requirement. It requires only that the Secretary's management measures be flexible enough to take into account sudden changed circumstances. The evidence is quite clear that the Council and the Secretary did in fact consider the 1994 survey data, but decided not to utilize that data in setting the 1995 quota. A.R. 846–850 (minutes of Council meeting, February 1–2, 1995); A.R. 1071–73 (final rule). Indeed, the promulgation of the quotas was delayed until May so that the Council and the Secretary could consider the 1994 survey data, which was not available to the Council when it first met in September, 1994. Had the Secretary and his designees rushed ahead with the quotas in late 1994 without pausing to even consider or review the 1994 survey data, the Court might have found that action arbitrary and capricious. But those facts are not before the Court. The Court therefore **FINDS** that the establishment of the quota was not arbitrary and capricious or an abuse of discretion in relation to National Standard Six.

### 5. *Failure to Comply with Amendment 8 (Count V)*

As noted above, Amendment 8 requires consideration of several factors in establishing the annual quota, including the current

stock assessment. *See* 50 C.F.R. § 652.21. Plaintiffs contend that defendant failed to comply with Amendment 8 because he failed to consider the "1994 stock assessments" and "biomass and recruitment estimates based on the 1994 survey data." Compl., ¶¶ 126–27.

This aspect of the claim requires little discussion. Although the most recent stock assessment report was not available to the Council when it first proposed the 1995 quotas during its September, 1994, meeting, the Council and the Secretary did in fact consider the 1995 stock assessment report, also known as the Report of the 19th Northeast Regional Stock Assessment Workshop (19th SAW). *See* A.R. 652–744 (at this stage the SAW report was in draft stage; the final version is at A.R. 937). The Council did so during its meeting of February 1–2, 1995, *see* A.R. 846–850 (minutes of Council meeting). The Council voted to endorse the SAW recommendation that the 1994 research survey data be set aside. The proposed rules were delayed until after that meeting, and published just a few days later, on February 6. A.R. 854. Finally, the Secretary's designee, the National Marine Fisheries Service (NMFS), considered the 1995 SAW report in promulgating the final rule. A.R. 1071. The 19th SAW report recommended that the quotas "be set even lower than the Council's proposed specifications." *Id.* But the NMFS concluded that because the Council's specifications remained within the range of estimated supply years, the Council's original recommendations were acceptable. *Id.* 1071–72. It was only the *1994 research survey data* that was not "considered," because it was regarded as unreliable.

Plaintiffs also contend that the supply year figures based on the stock assessments are infirm because they are based on only approximately 40 percent of geographic scope of the total biomass, in violation of the requirement that the Council consider information on "exploitable and spawning biomass relative to the optimum yield." 50 C.F.R. § 652.21(a)(1)(i).

 The pertinent regulation contains a detailed list of items that the Council shall "consider" in preparing the quota recommendations. The Council is instructed to "con-

sider current stock assessments, catch reports, and other relevant information" concerning a list of items, including "[e]xploitable and spawning biomass relative to the optimum yield." 50 C.F.R. § 652.21(a)(1) This instruction to "consider" such information as is "relevant" can hardly be read as a strict dictate. "Consider" means "examine" or "inspect." *Black's Law Dictionary* 306 (6th ed. 1990). "Relevant," as all lawyers know, is not a firmly fixed term, but involves subjective judgments. This does not mean that the Council has carte blanche to ignore plainly relevant information. But it does suggest that the Council has some discretion in recommending the quota.

 The stock assessments produced in both 1993 and 1995 examined the entire fishery. The 1993 stock assessment included biomass estimates of the entire geographic range of the species. Pl. Reply Br. at 7. Only the supply year range produced by the 1995 stock assessment focused on just two regions, Northern New Jersey and Delmarva. Both of these stock assessments were "considered" by the Council. The Council also "considered" or examined all the factors set forth in the regulation. *See, e.g.,* A.R. 77. The Court cannot say that the Secretary and his designees did not comply with Amendment 8.

Accordingly, the Court **FINDS** that the Secretary's decision was not arbitrary and capricious or an abuse of discretion in relation to Amendment 8.

### 6. *Establishment of "supply year policies" (Count VI)*

In 1993, the Mid–Atlantic Council established an internal "policy" designed to "guide the Council's actions in making quota recommendations" for surf clams and ocean quahogs. A.R. 95, A.R. 1073. The policy is to recommend the quota at a level that will allow fishing to continue, in the case of surf clams, at that particular level, for 10 years. The policy for ocean quahogs is 30 years. The objective of these time horizons is to "provide stability in the fishery." *Id.* Stated another way, the policy is aimed at preventing a continual "boom and bust cycle"

within the fishery. *See* Def. Ex. 9. The "policy" is critical to the quota process; the number chosen as the "policy" is used as the divisor in the quota-setting calculation used by the Council.

Plaintiffs contend that the use of the 10 and 30 year "supply year policies" amounted to an amendment to the fishery management plan, i.e., Amendment 8, thus requiring notice and comment under the Administrative Procedure Act. Compl. ¶ 131. Defendant contends that the Council does not have to promulgate rules regarding its internal procedures, and that the Court may review only whether the Secretary's decision was rational. Defendant cites to *Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456, 1464 (9th Cir.1987) (if Secretary can show rational basis for decision, procedural challenges to irregularities at Council level no justification for invalidating regulations).

Neither party addressed what this Court believes is the threshold question: is the Council an "agency" within the meaning of the Administrative Procedure Act?

■ By its terms, the notice and comment requirement of the APA applies to "rule making." 5 U.S.C. § 553(b). Rule making is only undertaken by "agencies." *See id.*, 5 U.S.C. § 553(c) & (e); 5 U.S.C. § 551(4) ("rule" defined as "whole or a part of an agency statement"); 5 U.S.C. § 551(5) ("rule making" means agency process for formulating rule). An "agency" is defined as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency...." 5 U.S.C. § 551(1). The Act excludes Congress, the Courts, and certain other bodies. *Id. See also* 5 U.S.C. § 701(b)(1) (identical definition of "agency" contained in judicial review provision of APA). A leading treatise has suggested that in determining whether an "entity is an agency.... the most important word in the definition may be 'authority'." 1 Kenneth C. Davis & Richard J. Pierce, Jr., *Administrative Law Treatise*, § 1.2 at 4 (1994).

Much of the pertinent case law on what constitutes an "agency" involves challenges under the Freedom of Information Act (FOIA), 5 U.S.C. § 552. Although that act contains a slight expansion of the term "agency" contained in 5 U.S.C. § 551, the change is not relevant to the issue facing this Court. *See* 5 U.S.C. § 552(f).[25] In *Renegotiation Board v. Grumman Aircraft Engin'g Corp.*, 421 U.S. 168, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975), the Supreme Court addressed a situation not far afield from the case at bar. There, a regional body of the Renegotiation Board, a federal government body charged with preventing excessive profits in government contracts, made recommendations to the National Board. The powers of the regional board were to investigate and recommend to the national Board, but the regional body could not decide cases. *Id.* at 185, 95 S.Ct. at 1501. Recommendations of regional bodies were reviewed *de novo* by the Board. The Court held that because the regional board had no legal authority to decide cases, and its recommendations carried no legal weight, it was not an "agency" within the meaning of FOIA. *Id.* at 189, 95 S.Ct. at 1502.

The Fourth Circuit has had occasion to address the question facing this Court only once. It does not assist the Court's determination here. *See Ritter v. Cecil County Office of Housing & Cmty. Develop.*, 33 F.3d 323, 327 (4th Cir.1994) (local public housing authority not an "agency" within meaning of APA).

Several cases in the D.C. Circuit, which frequently decides APA cases, are instructive. That court has held that an entity is an "agency" under FOIA where it exercises some "independent function" or can promulgate rules or guidelines on its own authority. For example, in *Soucie v. David*, 448 F.2d 1067 (D.C.Cir.1971), the court reviewed the role of the Office of Science and Technology, part of the Executive Office of the President. The court determined that although the Office did perform a role as adviser to the President, it was an "agency" because it exercised some "independent authority" in eval-

---

**25.** FOIA has a broader reach than the APA, and includes, *inter alia* any "executive department, military department, or Government corporation."

uating federal science programs. *Id.* at 1075. Moreover, the Office itself had, at the time FOIA was enacted, presumed that it was an agency subject to FOIA, because it published a notice in the Federal Register describing information available under FOIA. *Id.* Similarly, the Council on Environmental Quality, also located within the Executive Office of the President, was held to be an agency because it had some independent power to promulgate rules and issue guidelines government-wide. *Pacific Legal Foundation v. Council on Environmental Quality,* 636 F.2d 1259, 1262 (D.C.Cir.1980). By contrast, the Council on Economic Advisers—again, located within the Executive Office of the President—was determined to not be an "agency" because it had no regulatory power or the power to fund projects. Its role of merely advising and assisting the President exempted it from FOIA. *Rushforth v. Council on Economic Advisers,* 762 F.2d 1038, 1043 (D.C.Cir.1985).

Perhaps most closely analogous to the case at bar is *Washington Research Proj., Inc., v. Dept. of Health, Educ. & Welfare,* 504 F.2d 238 (D.C.Cir.1974). There, expert peer review panels referred to as "initial review groups," or "IRGs" scrutinized grant applications made by the National Institute of Mental Health, an agency of what was then the Department of Health, Education and Welfare (HEW).[26] The IRGs made recommendations to a National Advisory Mental Health Council, which consisted of three U.S. government officials and 12 private citizens. *Id.* at 242–43. That Council had the power to approve, disapprove, or defer consideration of any application. It then made recommendations to the Secretary of HEW about which projects to fund. The Secretary was authorized to make only such grants as were "recommended" by the Council. *Id.* at 246. The plaintiffs sought documents produced by the IRGs. Like the fishery councils in the case at bar, the IRGs had significant expertise and scientific knowledge which were greatly relied upon by the National Advisory Mental Health Council and the Secretary. The court held that the IRGs were not agencies because their role was limited to making recommendations, and because they had no authority to make grants—a power vested in the Secretary. *Id* at 246–47.

Against this background, the Court turns to examine the function and role of the Mid–Atlantic Fishery Management Council. The Magnuson Act provides that voting members of regional councils are "not employed by the Federal Government," although they receive compensation and expenses from the government when engaged in Council business. 16 U.S.C. § 1852(d). The staff members supporting the Council are paid by the Commerce Department, 16 U.S.C. § 1852(f)(7)(B), and the General Services Administration provides administrative support to the Council. 16 U.S.C. § 1852(f)(4). The Councils are exempt from the provisions of the Federal Advisory Committee Act, 5 U.S.C. app. § 1, although certain open meeting requirements similar to those found in that act apply to the Councils. 16 U.S.C. § 1852(j)(2). The Mid–Atlantic Council has 19 members, 12 of which are appointed by the Secretary. 16 U.S.C. § 1852(a)(2). The members appointed by the Secretary must be individuals with scientific expertise or occupational experience regarding fishery resources in the region. 16 U.S.C. § 1852(b)(2)(A). The other voting members are state fishery officials and the regional director of the National Marine Fisheries Service. 16 U.S.C. § 1852(b)(1)(A) & (B). The Councils are charged with preparing and submitting fishery management plans to the Secretary, conducting public hearings, and, in general, advising the Secretary on fisheries management.

In addition to these aforementioned functions, the Mid–Atlantic Council recommends to the Secretary the annual quotas governing the surf clam and ocean quahog fisheries. 50 C.F.R. § 652.21. Significantly, however, the Secretary does not merely review the recommendations and then make his own decision. He may change the quotas only if he can demonstrate that the Council's recommendations violate the national standards of the Magnuson Act or the objectives of the fishery management plan. *Id.*

---

**26.** The department was split under President Carter, creating the Department of Health and Human Services, and the Department of Education.

In general, then, the Councils appear to be designed to function as advisers, i.e., experts in the field who assist the Secretary in his role in managing the fishery. They cannot promulgate regulations, and they do not have any independent authority. Their role is to assist the Secretary. But the regulations governing the surf clam and ocean quahog fisheries suggest that the Mid–Atlantic Council has slightly more power than the average government advisory panel. Not only can it make recommendations about annual quotas, but the Secretary can alter these recommendations *only if* he finds they have violated certain parameters. As the detailed discussion above of several of the National Standards suggests, the Magnuson Act provides broad definitions which provide wide discretion to the decisionmaker. "Violation" of these standards or the "objectives" of the fishery management plan would, in short, would seem to require some sort of blatant abuse by the Council. In effect, therefore, the Secretary's review is not *de novo*, as in *Renegotiation Board*, but analogous to an "abuse of discretion" or "clear error" standard frequently employed by federal appellate courts.[27]

■ Nevertheless, although the question is a close one, the Court cannot conclude that the Mid–Atlantic Council is an "agency" within the meaning of the Administrative Procedure Act. Ultimately, it is not an "authority" of the U.S. Government because it

has no "authority" to do anything. It cannot promulgate the fishing quotas. It cannot issue rules affecting the fishery. Its power is limited to "recommending" the quotas to the Secretary. To be sure, the Secretary's power to reject those recommendations is somewhat circumscribed, unlike the power of the National Advisory Council in *Washington Research*, which was free to accept, reject, or defer recommendations for any reason. But at the end of the day, the Secretary does have the power to alter the recommendations of the Mid–Atlantic Council, and he alone has the power to promulgate the quotas.

■ Accordingly, the adoption of the "supply year policy" by the Mid–Atlantic Council does not violate the Administrative Procedure Act because the Council is not an "agency" within the meaning of that Act.[28]

### 7. The Quotas Wrongly "Limit Access" to the Fishery (Count VII)

The Magnuson Act permits the Secretary to prepare a fishery management plan which "establish[es] a system limiting access to the fishery." In establishing such a system, the Secretary must take into account certain factors, including "present participation," "historical practices", the "economics of the fishery," and the "capability of fishing vessels used in the fishery to engage in other fisheries." 16 U.S.C. § 1853(b)(6). Plaintiffs contend that the 1995 quotas "limit access" to

27. This arrangement gives the Court pause. The delegation of vast authority by Congress to the Executive during this century has effectively empowered Article II bodies to serve functions originally divided among three separate branches. In many areas of government, as here, the agency writes laws (in the form of regulations), enforces laws, and interprets laws. Review by the judicial branch is extremely narrow. Although this practice has been sanctioned by the courts, *see Amalgamated Meat Cutters & Butcher Workmen v. Connally*, 337 F.Supp. 737, 746–47 (D.D.C.1971) (collecting cases), the nearly unbridled power of the Executive is not without cost. James Madison, the Father of the Constitution, warned that "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands ... may justly be pronounced the very definition of tyranny." *The Federalist* No. 47, at 301 (Clinton Rossiter ed., 1961). Those who would weaken Madison's grand design have been aptly criticized by one of the Senate's leading students of the Constitution: "···· the survival

of the American constitutional system, the foundation upon which the superstructure of the Republic rests, finds its firmest support in the continued preservation of the delicate mechanism of checks and balances ...." 3 Robert C. Byrd, *The Senate, 1789–1989* 779 (1994). The role of the Council, and the circumscribed role of the Secretary in reviewing the Council's recommendations, raises a distinct, but perhaps no less profound, issue. The Secretary has apparently yielded power to a largely non-governmental advisory body. The propriety of this arrangement, at first blush, seems questionable. But the Court does not pass on this question, because it is not before the Court.

28. Even if the Court had found that the Council was an agency, it would then have to determine whether the "policy" was a "rule" or merely a general statement of policy, which is exempt under the APA. 5 U.S.C. § 553(b)(3)(A).

**1160**

the fishery, and that the Secretary failed to take into account the statutory factors. Compl. ¶ 136. The point is not pressed, however, in any of the three briefs submitted by plaintiffs.

Plaintiffs read the statute too narrowly. The statute provides that when the Secretary *establishes* a system "limiting access," he must take into account the aforementioned factors. Such a system was established by the Secretary five years ago. Amendment 8, that is, the overall regulatory scheme for the surf clam and ocean quahog fisheries "limits access" to the fishery, in that it established a system of "Individual Transferable Quotas (ITQ)"—a license to catch a certain percentage of the fishery annually—based on historical fishing patterns. The individual quotas for a particular year are set by applying the allocation percentages to the annual quotas. *See* 50 C.F.R. § 652.20. The ITQ system is a closed system, but allows for entry by the transfer of the quotas. The regulations explaining the term "limited access" make clear that the term applies to a management system such as Amendment 8, not the annual quotas implementing Amendment 8. *See* 50 C.F.R. § 602.15(c)(1) (regulation defining "limited access" system as a technique which "attempts to limit units of effort in a fishery ... [c]ommon forms of limited access are licensing of vessels, gear or fishermen to reduce the number of units of effort, and dividing the total allowable catch into fishermen's quotas").

■ Thus, the 1990 regulations promulgating Amendment 8 "established a system limiting access to the fishery" within the meaning of § 1853(b)(6). An action alleging failure to comply with the conditions set forth in § 1853(b)(6) was in order at that time. At least one of the plaintiffs here brought such a claim. *See Sea Watch Int'l v. Mosbacher,* 762 F.Supp. 370, 379 (D.D.C. 1991) (upholding challenge to ITQ system on grounds, *inter alia,* that § 1853(b)(6) violated). The annual quotas are merely the means of implementing that system.

■ Even if this construction of the statute is in error, there is sufficient evidence in the record that defendant did consider the various factors set forth in § 1853(b)(6) in establishing the 1995 quotas. *E.g.,* A.R. 73–78 (memorandum from Executive Director of Council regarding quota recommendations, dated September 2, 1994, discussing fleet trends, economics of fishery and other factors).

In short, this claim on Count VII is without merit.

## V. Conclusion

The Court recognizes that setting commercial fishing quotas is an imperfect process. The scientific information utilized is necessarily incomplete. One may fairly question the methods and assumptions used by the Secretary and his designees—as the plaintiffs did here. The Court shares some of the plaintiffs' skepticism about whether the scientists had employed scientific information to justify the initial decision of the Council to reduce the 1995 quotas.

Skepticism might have been enough for the Secretary of Commerce to send the quota recommendation back to the Council for further review—had he chosen to do so. But it is not enough for this Court under the Administrative Procedure Act. The Court must find that the Secretary and his designees were arbitrary and capricious in the quota-setting process. The Court did not so find; the quotas therefore will be upheld.

To recap: Defendant's motion to limit review to the Administrative Record is **DENIED**. The Secretary's actions in promulgating the 1995 quotas for surf clams and ocean quahogs were not arbitrary and capricious or an abuse of discretion. The adoption of the "supply year policy" by the Mid-Atlantic Fishery Management Council did not violate the Administrative Procedure Act as it is not an agency. Judgment is entered for defendant.

The Clerk of the Court is **DIRECTED** to forward copies of this order to counsel for the parties.

**IT IS SO ORDERED.**