**NORTH CAROLINA FISHERIES ASSO-CIATION, INC.**, East Coast Fisheries Association, Georges Seafood, Inc., Fos–Fish, Inc., Luther Smith & Son, Homer Smith Seafood, Inc., Plaintiffs,

State of North Carolina, Plaintiff–Intervenor,

v.

Ronald H. **BROWN**, Secretary of Commerce, Defendant.

Civil Action No. 2:95cv1178.

United States District Court, E.D. Virginia, Norfolk Division.

Feb. 16, 1996.

Waverley Lee Berkley, III, Mark Steven Davis, McGuire, Woods, Battle & Boothe, Norfolk, VA, for North Carolina Fisheries Association, Inc., The East Coast Fisheries Association, Georges Seafood, Inc., Fos–Fish, Inc., Luther Smith & Son, Homer Smith Seafood, Inc.

Daniel F. McLawhorn, North Carolina Department of Justice, Raleigh, NC, Michael Vincent Hernandez, Professor, Chesapeake, VA, Thomas F. Moffitt, North Carolina Department of Justice, Special Deputy Attorney General, Raleigh, NC, Timothy D. Nifong, Asst. Atty. General, North Carolina Department of Justice, Raleigh, NC, for State of North Carolina.

George M. Kelley, III, United States Attorney's Office, Norfolk, VA, Samuel D. Rauch, III, U.S. Dept. of Justice, Env. & Natl. Res. Div., Wildlife & Marine Res. Section, Washington, DC, Allison Rumsey, U.S. Department of Justice, General Litigation Section, Environmental & Natural Resources Division, Washington, DC, for Ronald H. Brown.

George M. Kelley, III, United States Attorney's Office, Norfolk, VA, Samuel D. Rauch, III, U.S. Dept. of Justice, Env. & Natl. Res. Div., Wildlife & Marine Res. Section, Washington, DC, for Ronald H. Brown.

Brian L. Buniva, Mezzullo & McCandlish, Richmond, VA, Beth S. Ginsberg, Bogle & Gates, Washington, DC, for American Sport-

fishing Association, Coastal Conservation Association, amici.

Patrick Andrew O'Hare, Hazel & Thomas, Richmond, VA, Paul A. Lenzini, Jeffrey O. Moreno, Donelan, Cleary, Wood & Maser, P.C., Washington, DC, for Atlantic States Marine Fisheries Commission.

## OPINION AND ORDER

DOUMAR, District Judge.

This case involves a challenge to a final rule promulgated by Ronald H. Brown, Secretary of Commerce ("Secretary"), which imposes a moratorium on the possession and harvesting of Atlantic Coast weakfish ("weakfish") in the Exclusive Economic Zone ("EEZ"). The parties bringing this challenge, a coalition of fishermen and seafood processors, joined by a sovereign state, seek a permanent injunction to prevent enforcement of the rule. Because the Court concludes that the Secretary acted in excess of his statutory authority, the Court will grant their request.

### I. Procedural Background

On June 20, 1995, the Secretary, acting pursuant to the Atlantic Coastal Fisheries Cooperative Management Act (hereafter "Atlantic Coastal Act"), 16 U.S.C. §§ 5101–5108, issued a proposed rule and requested public comment on regulations to prohibit the possession in or harvest from the EEZ of Atlantic Coast weakfish;[1] 60 Fed.Reg. 32130. The Secretary's designee, the National Marine Fisheries Service, then conducted nine public hearings and received written comment from individuals, associations, and states along the East Coast. On November 27, 1995, the Secretary issued a proposed final rule, which, except for the area affected by the injunction issued by this Court on December 20, 1995, see infra, took effect on

December 21, 1995. 60 Fed.Reg. 58246; Administrative Record 1210 (hereafter "AR").

On December 8, 1995, plaintiffs[2] filed this action alleging that (1) the Atlantic Coastal Act violates the Tenth Amendment to the U.S. Constitution; (2) the rule violates § 804(b)(1)(A) of the Atlantic Coastal Act, 16 U.S.C. § 5103(b)(1)(A), because it does not meet the "necessity" requirement of that section; and (3) the rule violates several national standards contained in § 301 of the Magnuson Fishery Conservation and Management Act, 16 U.S.C. § 1851 (hereafter "Magnuson Act"), which apply to the Atlantic Coastal Act. 16 U.S.C. § 5103(b)(1)(B). Plaintiffs also moved for a preliminary injunction.

On December 18, 1995, this Court conducted a hearing on the motion for preliminary injunction, receiving testimony from experts for both parties. On December 20, 1995, this Court issued a preliminary injunction preventing the Secretary from enforcing the moratorium as promulgated in the EEZ seaward from the coast of North Carolina; the moratorium along the rest of the Atlantic Coast was unaffected by the injunction. The injunction was qualified by certain conditions, specifically: (1) the continuation of existing North Carolina regulations proscribing flynet fishing south of Hatteras and imposing a 10 inch minimum on weakfish harvested; (2) the injunction applied only to fishing vessels registered under the law of North Carolina; and (3) the Court required plaintiffs to submit data on weakfish landings on two occasions prior to the February hearing, so that the Court could determine if the injunction should be modified or terminated. On December 21, 1995, the Court issued an opinion justifying the injunction, and decreed that the injunction would expire on February 15, 1996 (unless this Court took further action).

---

**1.** The scientific name of weakfish is *Cynoscion regalis*. Administrative Record 44.

**2.** The North Carolina Fisheries Association is a non-profit North Carolina corporation with approximately 1000 members. The East Coast Fisheries Association is a Virginia corporation located in Virginia Beach. Georges Seafood, Inc., is a Virginia corporation with its principal office in Norfolk; it is a wholesale fish dealer.

Fos–Fish, Inc. is a North Carolina corporation which operates a fishing vessel at Hatteras. Luther Smith & Son is a North Carolina corporation which operates three fishing vessels and two packing houses. Homer Smith Seafood, Inc., is a North Carolina corporation which operates four fishing vessels and two fish packing houses. Amended Plaintiffs' Compl. ¶¶ 5–10.

On January 3, 1996, the Court granted a motion by the State of North Carolina (hereafter "North Carolina")[3] to intervene as party plaintiff. North Carolina's complaint in intervention alleged that the Secretary exceeded his authority under the Atlantic Coastal Act on two grounds (including one not raised by the Coalition) and also alleged a violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, et seq.

On January 19, 1996, the Court denied a motion by the Atlantic States Marine Fisheries Commission to intervene as party defendant on the ground that it was untimely; the Commission was, however, granted permission to file an amicus brief on any issue in the case. On that same day, the American Sportfishing Association and the Coastal Conservation Association were permitted to file a joint amicus brief.

On January 23, 1996, after hearing argument during a telephone conference, the Court orally granted defendant's motion to quash a deposition of Rolland Schmitten, the Assistant Administrator for Fisheries at the National Oceanic and Atmospheric Administration, an agency of the Commerce Department.

On January 31, 1996, the Court granted North Carolina's motion to amend its complaint in intervention to add a new claim to the NEPA count. The Coalition has also filed an amended complaint adding the same NEPA claims raised by North Carolina.

On February 6 and 7, 1995, the Court heard oral argument from the parties.

All parties have all moved for summary judgment. All parties also agree that no material facts are in dispute, and that review in this action should be limited to the Administrative Record before the Court.[4]

Jurisdiction is appropriate pursuant to 28 U.S.C. § 1331.

## II. Factual Background

The Secretary seeks the moratorium on harvesting and possession of weakfish to address what he regards as a dangerous decline of the weakfish fishery. See AR 923 (proposed rule) ("[w]eakfish are overfished and are in a continuing serious decline").

The Secretary's premise rests on analysis of historical data of the fishery. As with any empirical analysis, however, the conclusion derived depends significantly on the type of data compared, and the base years utilized. So, too, with the weakfish fishery. Using 1980 as a statistical base year, the defendant's designees build an impressive argument of the fishery's decline, permitting them to sound the alarm that the weakfish fishery is in danger of catastrophic collapse.

What the Secretary and his designees fail to emphasize, however, is this significant fact: 1980 was greatest year, in terms of landings, that the fishery has enjoyed since World War II. Thus, every year since, measured against this high standard, suggests "decline." But a fair reading of the Administrative Record, including some of the very data upon which the Secretary relies heavily, suggests that the situation is not as dire as described by the defendant and his designees.

Data on weakfish landings date back to the 19th century. (AR 30–31) (table representing landings from 1880 to 1985). This data is considered "complete" from 1929 onward. (AR 30) ("records prior to 1929 are incomplete"). Therefore, 1930 is an appropriate place to begin a review of the data.

The weakfish fishery enjoyed a boom year in 1930 in terms of commercial landings (16,182 metric tons) (AR 31), another boom year in 1945 (18,784 metric tons) (AR 31), and again in 1980 (16,293 metric tons) (AR 31). See also AR 1183–84 (table showing commer-

---

3. To avoid confusion in this opinion, the original plaintiffs will be referred to hereafter as the "Coalition." The State of North Carolina will be referred to as "North Carolina."

4. The Court has not so limited itself in previous fisheries cases. See J.H. Miles & Co., Inc. v. Brown, 910 F.Supp. 1138, 1146–1148 (E.D.Va.

Dec. 4, 1995). In that case, the Court heard expert testimony in order to gain a better understanding of the scientific evidence in the Administrative Record. The Court continues to believe that taking such evidence is both proper and necessary, see id. at 1138–1146; it was not necessary, however, in this case.

cial landings from 1946–1994).[5] In between the peak of 1945 and 1980, the fishery suffered what appears to be two dramatic lean periods. In the early 1950s, and again throughout the 1960s, landings were at levels comparable to, or below, the commercial landings in this decade.

Unquestionably, the fishery has declined dramatically as compared to the peak of 1980. In that year, for example, commercial landings were 16,312 metric tons; recreational landings were 19,355 metric tons. By contrast, in 1994, commercial landings were just 2,767 metric tons, and recreational landings stood at a mere 800 metric tons. (AR 1173).

Other data tell a similar tale. The spawning stock biomass in 1980 was 32,436 metric tons; in 1994, it was 10,119. (AR 1176). The fishing mortality rate in 1980 was 1.19; in 1994, 1.59. During the period from 1979 to 1986, mortality averaged 1.04; from 1987 to 1994, it averaged 1.83. (AR 1174).[6] The recruitment index in the federal survey[7] was at 5.17 in 1994, compared to a peak of 10.39 in 1985. (AR 1175).

But a review of the data from a different perspective—comparing different time periods—tells a different story. Had the defendant chosen 1964 (32 years ago instead of 16 years ago) as the base year, the fishery would be considered in good health today. In that year, commercial landings were 1,633 metric tons (AR 32). Commercial landings in the first four years of the 1990s were as follows (all values are in metric tons): 3,943 (1991); 3,390 (1992); 3,190 (1993); 2,767 (1994).[8] At no time in this decade has the level of landings fallen to the low levels reached in the 1960s. In other words, every year from 1959 through 1969 saw commercial

landings at a *level below* the most recent years. The *highest* level of landings in the 1960s was 2,463 metric tons in 1965; the lowest was 1,397 metric tons in 1967. From there, a steady increase began, ending with the peak of 16,312 metric tons in 1980. The 1950s were not much better than the 1960s: in the early part of the decade, landings were at a level comparable to the early 1990s. (AR 1183).

A review from another perspective suggests the fishery is recovering; much of the data from the most recent years show improvement as compared to the late 1980s and early 1990s. For example, in 1994, fishing mortality was 1.59, compared to 1.82 the year before, and the average of 1.44 from the period 1979–94. (AR 1174). The recruitment index in the federal survey was 5.17 in 1994, compared to 2.03 in 1993, and the average of 5.26 in the years 1982–94. (AR 1175). The spawning stock biomass in 1994, 10,119 metric tons, compares favorably to 3,079 metric tons in 1991, and the average from 1986–94 (8,524 metric tons). (AR 1176).

Even accepting the defendant's own base period as the starting point, the data can tell different tales. For example, defendant designees make much of the fact that spawning stock biomass in 1994 was 10,119 metric tons. They report that "this is well below the long term mean of 13,601 metric tons and well below the peak levels of over 30,000 metric tons in 1979 and 1980." (AR 1133). On its face, this assertion is indisputable.

But that is not the end of the story. The data proffered by the defendant's designees is skewed considerably by the two peak years of 1979 and 1980, both of which far exceed every other year in the table, which runs

---

5. For reasons not readily apparent from the record, the total landings, in terms of metric tons, differs between the table at AR 31–32, and AR 1183–84. The earlier table was included in a 1985 report; the latter table is found in the Final Environmental Impact Statement in this action. The differences are not of great moment; the total in 1980 in the second table is 16,312 metric tons. AR 1183.

6. The current estimate of "F", or mortality, at which the stock theoretically will collapse is 1.8; the desired rate, termed $F_{20}$ (the rate at which 20

percent of the potential weakfish spawning stock is conserved, which is the proposed goal of the federal regulation), is 0.45. (AR 1133).

7. Recruitment measures the number of fish added to the fishery each year due to growth and/or migration into the fishing area. The measure here is in "fish per tow."

8. The low levels in this decade, it bears emphasis, are due in part to conservation measures imposed by the states.

from 1979 to 1994.[9] To avoid being misled by extreme values in a data set, statisticians often calculate the median, that is, the number in the middle of the set.[10] Of the 16 years in table 4 (AR 1776) (column 3), the median would be an average of the middle two years—in this case, 1994 (10,119 metric tons) and 1985 (10,217 metric tons). The average of these two figures is 10,168 metric tons. Looked at in this light, 1994 was just below the median of the range. Alternatively, discarding the two peak years of 1979 and 1980, the average of the remaining years (1981 through 1994) is 10,413 metric tons. Again, viewed from this perspective, the spawning stock biomass in 1994 (10,119 metric tons) does not suggest "decline" but an "average" year.

This brief review of the data indicates that the record is open to an interpretation different than that presented by the Secretary's designees. Certainly, there is enough here to suggest that skepticism is warranted about their predictions of impending doom; this is particularly so in view of an assertion made that "over the last two to three years ... [the weakfish] stock has continued to decline precipitously" [11]—a statement unsupported by the record.[12]

To be sure, the weakfish fishery is not in a state of good health. But there is long continuum between "healthy" and "on the brink of collapse." Where the weakfish fishery stands on that continuum is, and will remain, a debate for the "experts." A fair case can surely be made, however, that the fishery is, as the recent data suggest, recovering from the valley of the late 1980s and early 1990s, and is considerably healthier than it was in the 1960s and late 1950s. Moreover, as the Record makes clear, dramatic changes in abundance are not unknown to the fishery. (AR 30) ("[t]remendous fluctuations in the apparent levels of abundance of weakfish have been reported throughout the history of the fishery"). Undeniably, the fishery recovered from the lean years of the 1960s; no evidence has been offered that management measures led to this turnabout.

All this is not to draw any definitive conclusions about the current state of the fishery. The Court is neither a marine biologist nor a statistician, and need not determine this question. But the Court can rely on common sense. And common sense suggests that the projections of imminent collapse of the fishery by the defendant's designees are not apparent from a review of the entire record.

Had the Court proceeded to all the claims brought by plaintiffs—particularly whether the moratorium is "necessary," as the statute requires—more extensive review and analysis of the record would have been necessary. The foregoing is presented primarily to highlight the nature of the litigation between the parties—in essence, to explain why the Coalition and the State of North Carolina have made a federal case out of this dispute. Stated simply, the case is about whether the fishery is verging on collapse, and thus in need of protection by means of a moratorium in federal waters; the Secretary's designees answer both questions in the affirmative, the State of North Carolina and the commercial fishermen do not. Additionally, the State of North Carolina argues that its regulations would achieve greater conservation results than the federal proposal; that question is bound up with the determination of whether the moratorium is "necessary."

As it turns out, the Court need not pass on those issues, and thus most of the record is not necessary to the determination of this case, which is decided solely on the legal question of the Secretary's authority.

### III. Legal Standards

■ The question of whether the Secretary exceeded his authority under the stat-

9. No other year in the table exceeds 20,000 metric tons. The years *1979* (39,573 metric tons) and 1980 (32,436 metric tons) are *more than twice* the amount in *every other year,* save two, 1981 (18,249 metric tons) and 1982 (16,741 metric tons).

10. John E. Freund & Gary A. Simon, *Modern Elementary Statistics* 49 (8th ed. 1992).

11. AR 2448.

12. For example, the spawning stock biomass in 1994 was 10,119 metric tons, a sharp rise from the 3,079 metric tons recorded in 1991. (AR 1176).

ute, the only issue reached by the Court, is a question of law that is reviewed *de novo.* 5 U.S.C. § 706(2)(C). The normal deference accorded to agency interpretation of statutes under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) is not appropriate where, as here, Congress has "directly spoken" to the question in the statute itself. *Id.* at 842, 104 S.Ct. at 2781. *See Stupak–Thrall v. United States,* 70 F.3d 881, 886 (6th Cir.1995) ("question of whether an agency has been granted authority to issues rules and regulations is a question of law and subject to *de novo* review").

### IV. Discussion

■ The threshold question presented is whether the Secretary acted in excess of the authority granted him by the Atlantic Coastal Act. The Court's review begins, as it must, with the text of the statute itself. *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 685, 105 S.Ct. 2297, 2301, 85 L.Ed.2d 692 (1985). The Court may go beyond the plain meaning of the statutory terms only if there is a clearly expressed legislative intent to the contrary, *Russello v. United States,* 464 U.S. 16, 20, 104 S.Ct. 296, 298–99, 78 L.Ed.2d 17 (1983), in the rare case where literal application of the statute produces a result "demonstrably at odds with the intention of the drafters," *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982), or where it would produce an absurd result. *In re Maxway Corp.,* 27 F.3d 980, 982 (4th Cir.1994) (citing *United States v. American Trucking Ass'n,* 310 U.S. 534, 543, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940)).

The Atlantic Coastal Act was enacted just over two years ago, Pub.L. No. 103–206, Title VIII, 107 Stat. 2447–53 (Dec. 20, 1993), and thus the Court is sailing in uncharted waters, unguided by any judicial precedent. The

stated purpose of the Atlantic Coastal Act is to "support and encourage the development, implementation, and enforcement of effective interstate conservation and management of Atlantic coastal fishery resources." 16 U.S.C. § 5101(b). It is aimed at species that "migrate, or are widely distributed, across the jurisdictional boundaries of two or more ... Atlantic States and of the Federal Government." 16 U.S.C. § 5101(a)(1); *see also* 16 U.S.C. § 5102(2) (definition of "coastal fishery resource").

The Act establishes a state-federal cooperative mechanism to regulate these migratory fisheries. The Atlantic States Marine Fisheries Commission (hereafter "Atlantic Commission" or "Commission"), which consists of the Atlantic Coast states, the District of Columbia, and the Potomac River Fisheries Commission,[13] represents the affected states. The Atlantic Commission is charged with developing "coastal fishery management plans" which the member states are required to implement. 16 U.S.C. § 5104. In preparing such a plan for a fishery located both in state and federal waters, the Atlantic Commission is required to consult with the appropriate regional fishery councils established under the Magnuson Act. *Id.; see* 16 U.S.C. § 1852 (listing of regional councils under the Magnuson Act).

The Atlantic Coastal Act provides two means for enforcing the coastal fishery management plans. One method, not used by the Secretary in the case at bar, empowers the Atlantic Commission to certify that states which fail to take the necessary actions are out of compliance with the plan. 16 U.S.C. § 5105. The Secretary of Commerce is then authorized to impose a moratorium on fishing in the fishery in question in the waters of the noncomplying state. 16 U.S.C. § 5106(c).[14]

---

**13.** *See* 16 U.S.C. § 5102(13) (list of states party to Commission). The Commission was formed in 1942 pursuant to an interstate compact which was approved by Congress. Pub.L. No. 77–539, 56 Stat. 267 (1942) and Pub.L. No. 81–721, 64 Stat. 467 (1950) (amendment to original compact). Virginia has decided to withdraw from the Commission, effective July 1, 1996. Va.Stat. Ann. § 28.2–1000 (Michie Supp.1995) (noting

that section affirming Virginia's participation in Commission repealed, effective July 1, 1996, pursuant to 1995 Va.Acts, c. 283).

**14.** The Coalition challenges the constitutionality of this provision. Because of the Court's determination that the Secretary exceeded his authority, it is not necessary to reach this question.

The provision used by the Secretary to propose the moratorium in the EEZ,[15] or federal waters—the rule at issue here—is set forth in § 5103(b)(1). It reads, in pertinent part, as follows:

> In the absence of an approved and implemented fishery management plan under the Magnuson Fishery Conservation and Management Act, and after consultation with the appropriate [regional Magnuson Act] Councils, the Secretary may implement regulations to govern fishing in the exclusive economic zone that are—
>
> (A) necessary to support the effective implementation of a coastal fishery management plan; and
>
> (B) consistent with the national standards set forth in Section 301 of the [Magnuson Act].

These regulations "may include measures recommended by the Commission to the Secretary that are necessary to support the provisions of the coastal fishery management plan." *Id.* The statute defines a "coastal fishery management plan" as a plan for managing a coastal fishery resource, prepared and adopted by the Atlantic Commission, that—

> (A) contains information regarding the status of the resource and related fisheries;
>
> (B) specifies conservation and management actions to be taken by the States; *and*
>
> (C) *recommends actions to be taken by the Secretary in the exclusive economic zone to conserve and manage the fishery.*

16 U.S.C. § 5102(1) (emphasis added).

It is undisputed that there is no "approved fishery management plan" under the Magnuson Act for the weakfish fishery. What is contested by the parties is whether the existence of recommendations by the Atlantic Commission under § 5102(1)(C) is a prerequisite to action by the Secretary in federal waters.

North Carolina contends that because the Atlantic Commission has not "recommended" any "actions" for the Secretary to take in the EEZ, the Secretary is powerless to act. Stated another way, North Carolina argues that before the Secretary can regulate a migratory fishery under the Atlantic Coastal Act, the Atlantic Commission must set forth recommendations in its coastal fishery management plan—in effect, tendering a request to the Secretary to act. Because the current coastal fishery management plan for weakfish contains no such recommendation, the argument goes, the Secretary has no authority to regulate weakfish in the EEZ (in the absence of regulations under the Magnuson Act).

 A straightforward reading of the law indicates that North Carolina's position is the correct one. The statute requires that a "coastal fishery management plan" contain three elements—information on the stock, specific conservation measures for the states to implement, and "recommended actions" to be taken by the Secretary. Without these three elements, including the "recommended actions" to be taken by the Secretary, any "coastal fishery management plan" issued by the Atlantic Commission is not, under the terms of the statute, a qualifying plan. The three elements contained in the definition are conjunctive: each element is necessary for a plan to fall within the definition of "coastal fishery management plan." No other reading is possible.

The existing weakfish plan does contain the first two elements, that is, information on the stock and specific measures for the states to undertake. The critical question remaining is whether the existing weakfish plan "recommends actions to be taken by the Secretary."

The original weakfish management plan was adopted by the Atlantic Commission in October, 1985. (AR 10–146). The plan contains seven "objectives" and two management measures. (AR 39–40). There is no

---

15. The Exclusive Economic Zone is the area running three nautical miles to 200 nautical miles from shore. 16 U.S.C. § 5102(6). These "federal waters" are, in general, regulated by the U.S. government under the Magnuson Act. The area from the shore out to three nautical miles is generally regulated by the states; this area is often referred to as "coastal" or "in-state" waters.

1116

mention of any recommended actions that the Secretary should take. The Atlantic Commission adopted a major amendment to the weakfish plan, referred to as Amendment 1, in 1991. (AR 244–313). It prescribed several management recommendations to the states. Recommendation 7 called on the Mid–Atlantic Fishery Management Council (a Magnuson Act regional council) (hereafter "Mid–Atlantic Council" or "Council") to "move as soon as possible to implement complementary management measures for weakfish in the Exclusive Economic Zone." (AR 249). Amendment 2 to the weakfish plan, adopted in October 1994, contains five management measures. (AR 314–16). It does not recommend any actions to be taken by the Secretary in the EEZ.

North Carolina argues that Amendment 2 supplanted Amendment 1, and that therefore the recommendation contained in Amendment 1 that the Mid–Atlantic Council take action in the EEZ is without effect. This argument is unavailing. The stated purpose of Amendment 2 is to "clarify" certain requirements and "incorporate other modifications approved by Weakfish Management Board" of the Atlantic Commission. (AR 314). A comparison of the management measures in Amendment 2 with those in Amendment 1 confirms that it modifies, but does not replace, Amendment 1. By contrast, the draft Amendment 3, now being developed by the Atlantic Commission, would "completely replace[ ] the original FMP (fishery management plan) and all subsequent amendments." (AR 1476).

But this conclusion does not end the inquiry. The next question is whether, as defendant contends, the recommendation in Amendment 1 that the Mid–Atlantic Council move to implement complementary management measures in the EEZ satisfies § 5102(1)(C) of the Atlantic Coastal Act.

The defendant attempts to finesse the point by equating the Mid–Atlantic Council with the "federal government." Def.Br. at 8 (the Commission, in Amendment 1, "recommended that the *federal government* move as soon as possible to implement ... management measures"). A close reading of the Magnuson Act reveals, however, that the

Mid–Atlantic Council is not the federal government, or an agent thereof. This Court reviewed the role of the Mid–Atlantic Council extensively in *J.H. Miles & Co., Inc. v. Brown,* 910 F.Supp. 1138 (E.D.Va.1995). There, the Court held that the Mid–Atlantic Council is not an "agency" of the federal government within the meaning of the Administrative Procedure Act ("APA"), and therefore its internal policies were not subject to the rule-making procedures of the APA. *Id.* at 1158–1160. It follows that if the Council is not an "agency" of the federal government, it cannot be considered the equivalent of the "federal government."

More to the point, the Mid–Atlantic Council is not the same as the "Secretary," which is the term used in the Atlantic Coastal Act. It is clear that the Mid–Atlantic Council and the Secretary are distinct entities. They are defined as such in the Atlantic Coastal Act. 16 U.S.C. § 5102(5) & (12). Equally important, the Atlantic Coastal Act requires that the Atlantic Commission recommend actions to be taken by the "Secretary." It does not say that Commission must make recommendations "to be taken by the Secretary, or alternatively, by the Mid–Atlantic Council." The reason it does not is obvious. It is *the Secretary,* not the Mid–Atlantic Council, empowered to act under § 5103(b). The Secretary must "consult" the Mid–Atlantic Council before acting under § 5103(b), but the Council has no power to do anything under the Atlantic Coastal Act. Thus, the request in Amendment 1 to the Mid–Atlantic Council to take complementary measures in the EEZ cannot possibly qualify as "recommended actions" under the Atlantic Coastal Act.

Accordingly, the case comes down to this simple syllogism: in the absence of "recommended actions" by the Atlantic Commission, there exists no "coastal fishery management plan" within the meaning of the Atlantic Coastal Act. Therefore, because no plan is in effect, the Secretary is powerless to implement regulations "necessary to support the effective implementation" of that plan—because no plan (at least as the statute defines it) exists.

The Court cannot say that this result is "demonstrably at odds" with the intent of the drafters, or produces an absurd result. The primacy of the states, acting through the Atlantic Commission, in this statutory scheme is self-evident. The Act expressly provides that the "responsibility for *managing Atlantic coastal fisheries rests with the States* ... [i]t is the responsibility of the Federal Government to *support* such cooperative interstate management of coastal fishery resources." 16 U.S.C. § 5101(a)(4) (emphasis added). This section is as significant for what it says as for what it does not; it does not, for example, say that the states have *primary* responsibility, or that they have a *shared* duty with the federal government. It says, without qualification, that the "responsibility rests with the states." It would be hard to find a clearer expression of Congressional intent. This design pervades the statute—the Commission manages, the federal government supports. *See* 16 U.S.C. § 5103(a) (Secretaries of Commerce and Interior shall develop and implement program to support management efforts of Atlantic Commission); 16 U.S.C. § 5107 (Secretaries may provide financial assistance to the Commission); 16 U.S.C. § 5106 (Secretary may impose moratorium in waters of non-complying state following finding by Commission). The Secretary seeks to turn this framework on its head by initiating regulations, even though the Commission has not, through its fishery management plan, recommended actions for him to take.

The Administrative Record indicates that the defendant's designees understood the primacy of the states and the Atlantic Commission. For example, Mr. Richard Schaefer, an official of the National Marine Fisheries Service (a Commerce Department agency), described the statutory design in this way: "we (the federal government) are

supposed to be the tail on the dog under the Atlantic Coastal Act." (AR 2452). In this case, contrary to the legislative scheme, the tail ended up wagging the dog. Indeed, the defendant conceded at oral argument that the initiative for the federal regulation came from the National Marine Fisheries Service, not the Atlantic Commission ("we will stipulate to the fact that ... the National Marine Fisheries Service approached the Commission instead [of] the other way around, and asked whether or not [the federal government] should regulate").[16]

The literal reading of the statute is also supported by the Senate report on S. 1126, which was the basis for the provision as enacted.[17] In describing the definitional section, the report says this:

> The term "coastal fishery management plan" is defined as a plan (or amendment to a plan) for managing a coastal fishery resource and would be *required* to contain information regarding the status of the resource and related fisheries, to specify State conservation and management requirements, *and to recommend action to be taken by the Secretary to regulate fishing in the EEZ.*

S.Rep. No. 201, 103d Cong., 1st Sess., 1993 WL 484769 at 13 (1993) (emphasis added).

Similarly, the House report states that "[e]ach [Atlantic Commission] plan shall recommend appropriate action that the Secretary of Commerce may take in Federal waters to conserve and manage fisheries covered by the plan." H.R.Rep. No. 202, 103d Cong., 1st Sess. 9 (1993). Although the analogous language in the House bill was different than the provision in the enacted version, the difference does not change the Court's conclusion. The House bill had listed the required elements of each

---

**16.** Transcript of Proceedings, February 6, 1996, at 21–22 (preliminary draft).

**17.** The provision as enacted is derived from S. 1126 (103d Congress) introduced by Senators Hollings, Kerry and Sarbanes in June, 1993. 139 *Cong.Rec.* S7511–7514 (daily ed. June 17, 1993). The provisions at issue here went unchanged between the bill's introduction and enactment. It was passed by the Senate as part of a larger bill authorizing Coast Guard activities.

*See* 139 *Cong.Rec.* S16986–16992 (daily ed. Nov. 22, 1993) (passage in Senate) *and id.* at S16965–16967 (text of bill). The House had passed a different version earlier that year. 139 *Cong.Rec.* H5576–5578 (daily ed. Aug. 2, 1993). The House accepted the Senate version and sent it to the President on the same day the Senate passed the bill. 139 *Cong.Rec.* H10928–10946 (daily ed. Nov. 22, 1993).

plan developed by the Atlantic Commission. *Id.* at 2 (§ 3(a)(3) of H.R. 2134 as reported by House Merchant Marine Committee). The Senate bill, and the enacted version, merely placed these same elements (save one not relevant to this discussion) in the definitional section of the legislation.

■ The defendant suggests the Court should reach a contrary conclusion based on the absence of provisions similar to those found in the Magnuson Act. Specifically, he notes that §§ 304 & 305 of the Magnuson Act, 16 U.S.C. §§ 1854(c) & 1855, provide that the Secretary can only develop a management plan for federal waters, in the absence of a recommendation by one of the regional councils, in certain limited circumstances. The failure of Congress to include these provisions in the Atlantic Coastal Act, defendant avers, signifies that the Secretary need not wait for the Atlantic Commission's recommendations before acting. Defendant's argument misses the mark. To be sure, the construct in the Magnuson Act provides greater clarity; but the meaning of the provisions in the Atlantic Coastal Act is clear enough. And the doctrine of *in pari materia* is inapplicable where, as here, there is no ambiguity in the statute under consideration. Norman A. Singer, 2A *Sutherland Statutory Construction* § 51.03 (5th ed. 1992 & Supp. 1995).

The defendant also argues that the Atlantic Coastal Act does not constrain his powers in the manner urged by plaintiffs, given the permissive language in § 5103(b)(1) stating that the Secretary *"may* include measures recommended by the [Atlantic Commission]." The defendant contends that "this provision would be meaningless if the Secretary could only adopt measures that had been specifically recommended" by the Atlantic Commission. Def. Br. at 22. Of course, the Court must follow the well-settled rule that "each word in a statute should, if possible, be given effect." *Crandon v. United States,* 494 U.S. 152, 171, 110 S.Ct. 997, 1008, 108 L.Ed.2d 132 (1990) (Scalia, J., concurring in the judg-

ment). But this sentence is not rendered superfluous by the Court's holding. It means that once the Secretary *decides* to implement regulations—which he may do only after the Commission recommends actions—he has discretion to accept or reject the Commission's proposals. As the statutory framework makes clear, Congress wanted the Secretary to have the benefit of the Commission's suggestions before acting to regulate in the EEZ under this Act. The use of the word "recommend," itself a discretionary term,[18] indicates that the ultimate choice of the type of regulations used in the EEZ rests with the Secretary.

■ In sum, under the Atlantic Coastal Act, all power flows (in the first instance) to the Commission. The statute clearly requires that any coastal fishery management plan recommend actions to be taken by the Secretary in the EEZ. Either by an act of commission or omission, the Commission ignored this mandate, and thus rendered the Secretary powerless to act under this statute. The Commission, it will be recalled, issued Amendment 2 in 1994, after the enactment of the Atlantic Coastal Act. It could have, at that time, "recommended actions" to be taken by the Secretary; it did not (or it presumed, mistakenly, that the language in Amendment 1 would suffice). That choice is fatal to the rule proposed by the Secretary. To hold otherwise would be to rewrite the statute to delete § 5102(1)(C); that task is for Congress, not this Court.

The Court's holding does not mean that there will now be "open season" on the weakfish. North Carolina, where a substantial majority of commercial landings occur,[19] has in place management measures described above, i.e., a ban on flynets south of Hatteras and a ten-inch minimum; the state's representatives testified in the December hearing that there is no plan to alter these regulations. Other states along the Atlantic Coast have similar restrictions. None of these are affected by the Court's ruling. In addition, the Atlantic Commission is preparing, and is

**18.** Webster's defines the word "recommend" as "to present as worthy of acceptance or trial." *Webster's Ninth New Collegiate Dictionary* 984 (1989).

**19.** North Carolina harvested over 65 percent by weight and 85 percent by number of all commercially landed weakfish from Maine–Florida from 1984–94. AR 1135.

expected to soon complete, Amendment 3, a coastal plan containing management objectives similar to those contained in the proposed federal moratorium.

Nor does the Court's conclusion leave the Secretary without power to manage this fishery in the EEZ; it would be an odd result to conclude that he is unable to regulate what are, after all, federal waters. The Secretary has ample authority to regulate weakfish in the EEZ under the Magnuson Act. He could do so in the normal course, that is, after the appropriate regional council prepares a fishery management plan, or on his own if the council fails to act. 16 U.S.C. § 1854. Or, if an emergency necessitates prompt action, he could act immediately, "without regard to whether a fishery management plan exists." 16 U.S.C. § 1855(c). But he may not do so under the Atlantic Coastal Act absent recommendations from the Atlantic Commission.

The final rule therefore must be set aside, and is hereby **VACATED.** The Secretary of Commerce and his designees are hereby **ENJOINED** from enforcing the Atlantic Coast Weakfish Fishery Moratorium in the Exclusive Economic Zone, promulgated at 60 Federal Register 58246 (Nov. 27, 1995).[20]

The Clerk of the Court is **DIRECTED** to enter judgment for plaintiffs and plaintiff-intervenor. The Clerk is **FURTHER DIRECTED** to forward copies of this order by telefax to all local counsel for the parties, and to forward copies of this order to all counsel of record.

**IT IS SO ORDERED.**

---

**20.** The foregoing conclusion makes it unnecessary to reach the other issues raised by the Coalition and North Carolina.